2015 VT 2

## David Walsh v. Frank Cluba and Good Stuff, Inc.

[117 A.3d 798]

No. 13-134

Present: **Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morse, J. (Ret.), Specially Assigned**

Opinion Filed February 13, 2015

*Frank P. Urso* of *Reis Urso & Ewald, PC*, Rutland, for Plaintiff-Appellee/Cross-Appellant.

*Brice Simon* of *Breton & Simon, PLC*, Stowe, for Defendant-Appellant/Cross-Appellee Cluba.

*Ronald I. Merelman*, Stowe, for Cross-Appellee Good Stuff, Inc.

¶ 1. **Skoglund, J.** This case concerns a dispute over damage to a leased commercial space located on Church Street in Burlington, Vermont. The case was tried before a jury, which awarded plaintiff, landlord David Walsh, just under $11,000 in damages attributable to defendant, tenant Frank Cluba. Following the jury verdict, the trial court awarded Walsh over $44,000 in attorney's fees. Cluba appeals, arguing that the court erred by allowing Walsh to testify on the reasonableness of repair work done after Cluba vacated the property and by awarding Walsh an unreasonable amount of attorney's fees under the circumstances. Walsh

cross-appeals, arguing that the court erred by dismissing his claims against defendant Good Stuff, Inc., the business that Cluba and his partner incorporated shortly after Cluba signed the initial lease of the subject property. We affirm.

¶ 2. In August 2004, Cluba signed a three-year lease agreement for the rental of commercial space on Church Street. Two months later, in October 2004, Cluba and his business partner incorporated Good Stuff, Inc., of which Cluba was the president and a director, and turned over possession of the space to Good Stuff for the sale of adult novelties. The lease expired in August 2007, but Good Stuff continued occupying the space and paying rent until vacating the premises in October 2009. A provision in the lease agreement stated that any permissive holdover after the expiration of the lease shall be on a month-to-month basis, provided that all terms and conditions of the lease remained in full force during the holdover period.

¶ 3. Walsh sued Cluba in January 2010, alleging in his complaint that Cluba had defaulted on an extended lease agreement in effect through September 2011 and had left the premises in a damaged state. He sought damages for, among other things, unpaid rent, attorney's fees, and the cost of repairing the damaged premises. In November 2010, Walsh moved to amend the complaint to include Good Stuff as a defendant, citing authority for the proposition that a corporation formed after the execution of a contract previously executed by a promoter of that corporation may, by accepting the benefits of the contract, ratify the contract and thus be bound by it, even without formal or documented action. See *Rich v. Chadwick*, 136 Vt. 122, 124, 385 A.2d 677, 678 (1978) (citing *Koerber v. Middlesex Coll.*, 128 Vt. 11, 258 A.2d 572 (1969), as "authority for the proposition that a subsequently formed corporation may, by accepting the benefits of a contract, ratify the contract, even without formal or documented action"). The court granted the unopposed motion, and in December 2010, Walsh filed an amended complaint, alleging in part that Good Stuff, through its agent Cluba, had ratified the lease Cluba signed and then defaulted on an agreed extension of that lease.

¶ 4. In August 2011, defendants filed a motion for partial summary judgment in which they argued in relevant part that Good Stuff should be dismissed from the case because Walsh knew that the lease agreement was only with Cluba, Good Stuff never ratified the agreement, and Walsh made no attempt to bind Good

Stuff. Walsh opposed the motion, asserting that Good Stuff should remain in the case based on the doctrine of successor liability. In a January 12, 2012 decision, the trial court granted defendants' summary judgment motion, ruling that Good Stuff had not signed the lease and that Walsh had failed to point to any post-lease writing or action that could have bound Good Stuff to the lease. The court stated that the successor liability doctrine was inapplicable to this case, and that Walsh had abandoned his ratification theory by neither raising it nor offering facts to support it in his response to defendants' summary judgment motion. Accordingly, the court concluded that "[a]ll contractual claims against Good Stuff must be dismissed."

¶ 5. Walsh filed a motion to clarify, stating that a dispute had arisen among the attorneys as to whether the court's order had dismissed Good Stuff from the case, and asking the court to allow him to amend the complaint a second time to add a negligence claim against Good Stuff to seek damages incurred as the result of necessary repairs after defendants vacated the subject property. Over defendants' objections, the court granted the motion, and Walsh filed a second amended complaint alleging that defendants, including Good Stuff as the party in possession of the property, were liable for damages resulting from the cost of repairing the property after it was vacated.

¶ 6. A jury trial was held over two days in November 2013. At the close of plaintiff's case, Good Stuff moved, pursuant to Vermont Rule of Civil Procedure 50, for judgment as a matter of law with respect to Walsh's negligence claim. Good Stuff argued that Walsh had not claimed anything other than economic losses, which were not recoverable in tort. After noting that Good Stuff was a third-party beneficiary contractually bound by the lease, Walsh argued that the lease had expired and there was no valid extension of the lease, making Good Stuff an at-will tenant who had an independent duty towards Walsh. He also argued that the economic-loss rule did not apply because he was claiming physical damage to property in addition to economic losses. The trial court granted Good Stuff's Rule 50 motion on the record, ruling that the economic-loss rule precluded the tort claim because the instant dispute was completely covered by Walsh's and Cluba's contractual relations and because the parties' duties were defined by the contract, which required the tenant to leave the premises in the condition in which he took them. At the conclusion of the trial, the

jury awarded Walsh $10,793 in damages for breach of the lease agreement. In a February 26, 2013 decision following the jury verdict and a hearing on Walsh's motion for attorney's fees, the trial court awarded Walsh $44,600 in attorney's fees.

¶ 7. On appeal, Cluba argues that the trial court committed reversible error by (1) allowing Walsh to testify on the necessity and reasonableness of the repair work done on the premises, and (2) awarding Walsh an unreasonable amount of attorney's fees, considering the totality of the circumstances. Walsh cross-appeals, arguing that the court erred by (1) dismissing his contractual claims against Good Stuff on summary judgment, and (2) granting Good Stuff judgment as a matter of law during the trial on his negligence claim.

¶ 8. We begin with Cluba's evidentiary claim of error. Cluba argues that it was reversible error to allow Walsh to testify regarding the necessity and reasonableness of repair costs because Walsh's testimony was not based on his own perceptions and thus violated Vermont Rule of Evidence 701. Cluba contends that because Walsh's property manager had overseen the repair work, she was the only person with first-hand knowledge regarding the need for the work — and yet, despite being subpoenaed, she never appeared at trial to link Walsh's testimony on the cost of the work to her anticipated testimony confirming the need for the work. According to Cluba, because Walsh's testimony was based almost exclusively upon information ascertained from his property manager rather than his own perceptions, the trial court's admission of the testimony over his objection constituted an abuse of discretion and a violation of Rule 701, thereby depriving him of a fair trial. We disagree.

¶ 9. Rule 701 provides that a lay witness' testimony concerning the witness' opinions or inferences is limited to opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702."

¶ 10. Walsh testified that the subject property was in good condition when he leased it to Cluba but was not in a similar condition when defendants vacated it. When Walsh began listing the various repairs necessary to restore the property to its condition at the time he leased it to Cluba, Cluba's attorney

objected on grounds of the lack of a foundation for the testimony and a violation of Rule 701. At an ensuing bench conference, Cluba's attorney asserted that Walsh had no personal knowledge of what repairs were needed because his property manager had handled the repair work. At one point during the bench conference, Walsh's attorney stated that he intended to have the property manager testify. After the trial court ruled that it would "just take it as it comes," the direct examination of Walsh resumed.

¶ 11. Walsh then testified that he visited the subject property along with his property manager, Cluba, and Cluba's partner in November 2009 shortly after defendants had vacated it. He agreed that he got "a really good look at the condition of the premises." He testified that, at his instruction, the property manager took photographs of the premises and turned them over to him. He identified dozens of photographs as accurately depicting the condition of the premises at the time defendants vacated it, and those photographs were admitted into evidence without objection. Referring to the photographs, Walsh then proceeded to testify as to all the repairs required to restore the property to the condition in which he had leased it to Cluba, including: (1) replacing sheetrock destroyed by defendants removing strapping and slatwalls that had held their products; (2) dealing with dangling electrical wires left after the removal of fixtures; (3) repairing and painting trim and window frames; (4) repairing broken ceiling tiles; (5) repairing a damaged door; and (6) repairing components of the heating system that had been damaged.

¶ 12. Walsh further testified that his property manager gave him copies of the invoices for the required repair work. The court sustained Cluba's hearsay objection to admission of the invoices themselves, but allowed Walsh to testify as to what he paid to repair the damage to the premises observed after defendants left. Walsh then agreed that he reviewed, audited, and paid "each and every invoice related to repair costs." He expressed certainty that his written summary of those costs contained in . an exhibit reflected payments that he had actually made as the result of damage done to the premises by defendants. The trial court admitted the exhibit without objection after Walsh explained the basis for each of the individual expenses set forth in the summary. Walsh also testified that he had thirty-three years' experience as

a landlord and knew how to deal with contractors and not spend money unnecessarily.

¶ 13. ■ ■ Apart from the fact that Cluba fails to cite specific testimony that was the subject of his general Rule 701 objection, we find no merit to his objection to Walsh's testimony concerning the repair work that was done. Walsh testified as to his personal knowledge of the condition of the premises both when he leased it to Cluba and when defendants vacated it. He also testified that he personally audited the invoices for the work done to repair the premises. Thus, his testimony regarding the repairs was rationally based on his own perceptions, and the trial court did not abuse its discretion in admitting it. See Reporter's Notes, V.R.E. 701 (noting "broad discretion under this rule to allow 'lay' opinions where it is 'helpful' ").

¶ 14. Cluba's second claim of error is that the trial court abused its discretion by awarding Walsh an unreasonable amount of attorney's fees under the circumstances of this case, including that: (1) defendants prevailed on a majority of the issues litigated; (2) at least $8000 of the fees awarded to Walsh were for Walsh's unnecessary and unsuccessful litigation against Good Stuff; (3) Walsh's attorney acknowledged that Walsh was not likely to prevail on the most prominent claim in his complaint — the alleged lease extension; and (4) the attorney's fee award was unreasonably disproportionate to the damage award. According to Cluba, the attorney's fee award is unreasonable considering these factors, particularly given that the issues in the case were neither novel nor complex and no specialized skill was required to litigate the case.

¶ 15. ■ Generally, under the "American Rule," parties bear their own litigation costs, including attorney's fees, unless provided otherwise by contract or statute. *L'Esperance v. Benware*, 2003 VT 43, ¶ 21, 175 Vt. 292, 830 A.2d 675. In this case, the parties do not dispute that the lease agreement provided for an award of attorney's fees based on a breach of the agreement, but that the fees must be reasonable. In determining a reasonable attorney's fee award, courts first calculate a "lodestar figure" representing "the number of hours reasonably expended on the case multiplied by a reasonable hourly rate," and then may adjust "that fee upward or downward based on various factors," including "the experience of the attorney, and the results obtained in the

litigation." *Id.* ¶ 22; accord *Kwon v. Eaton*, 2010 VT 73, ¶ 21, 188 Vt. 623, 8 A.3d 1043 (mem.). Because the adequacy of a trial court's award "depends on the unique facts of the underlying case," and the trial court is "in the best position to evaluate the reasonableness of legal fees" in a particular case, we "afford a trial court's determination as to the amount of an award great discretion and will disturb it only if the court has abused that discretion." *Kwon*, 2010 VT 73, ¶¶ 13, 22.

¶ 16. At the hearing on Walsh's motion for attorney's fees, Cluba argued that: (1) Walsh should not be awarded fees incurred as the result of him pursuing his eventually abandoned claim that Cluba had entered into a lease extension or attempting to make Good Stuff jointly liable for the damages; and (2) the requested fees were disproportionate to the jury's compensatory award. Cluba did not attempt to parse the reasonableness of particular legal fees claimed by Walsh, but rather argued that $10,000 would be a reasonable amount of attorney's fees in a case like this. Walsh's expert at the hearing testified that approximately $8300 of Walsh's attorney's fees were spent on making Good Stuff part of the case, but that it would have been malpractice not to have attempted to add Good Stuff as a defendant under the circumstances of this case. The expert further testified that Walsh's attorney's fees were reasonable in this case, and that it would be impossible to parse out what part of the expenses could be attributed to the lease-extension claim because all of Walsh's claims, including that one, were aimed at obtaining damages for breach of the lease agreement in this landlord-tenant dispute.

¶ 17. In a written decision in response to Walsh's motion for attorney's fees, the trial court found that both sides vigorously litigated the case, that the hourly rate of Walsh's attorney was reasonable for an experienced Vermont attorney, and that his billing record accurately reflected the number of hours he had spent on the case. The court identified the principal issue in dispute as whether the attorney's fees should be reduced by the time that Walsh's attorney spent on issues on which Walsh did not prevail — specifically, keeping Good Stuff in the case and claiming that Cluba had agreed to a lease extension. The court declined to reduce Walsh's attorney's fee award simply because he did not prevail on all of his claims or arguments. The court determined that all of the issues raised by Walsh's attorney were legitimate issues created by the circumstances of the case. The court stated

that it was particularly appropriate, under the circumstances, for Walsh's attorney to attempt to keep Good Stuff in the case, and that the defense of the case might have gone in a different direction had he not done so. Accordingly, the court awarded Walsh the full amount of attorney's fees requested.

¶ 18. ■ We conclude that the trial court's award of attorney's fees was within its wide discretion. At the outset, we reject Cluba's argument that the trial court should have reduced the award because he was the prevailing party on the majority of issues raised. Cluba did not make this argument per se before the trial court but rather made the related argument that the award should be reduced to the extent he prevailed on the lease-extension issue and whether to keep Good Stuff in the case. Without question, the trial court acted within its discretion in treating Walsh as the prevailing party, considering that the jury awarded him significant compensatory damages based on its conclusion that Cluba had breached the lease agreement. Cf. *Burton v. Jeremiah Beach Parker Restoration & Constr. Mgmt. Corp.*, 2010 VT 55, ¶ 8, 188 Vt. 583, 6 A.3d 38 (mem.) (stating that trial court has considerable discretion and flexibility in determining who is prevailing party in awarding attorney's fees under prompt payment act).

¶ 19. Moreover, as Walsh's expert stated, Walsh's abandoned lease-extension claim was one of the claims aimed at obtaining damages for Cluba's alleged breach of the lease agreement. The trial court did not abuse its discretion by refusing to reduce the attorney's fees award based on Walsh's lack of success on one of the theories litigated to demonstrate a breach of that agreement. See *id.* ¶ 12 (affirming trial court's ruling that it was not required to break down winning and losing claims to determine reasonableness of attorney's fee award); *Elec. Man, Inc. v. Charos*, 2006 VT 16, ¶ 9, 179 Vt. 351, 895 A.2d 193 (rejecting request under prompt payment act to break lawsuit into series of discrete claims so that hours expended can be divided and compensated on claim-by-claim basis); *L'Esperance*, 2003 VT 43, ¶ 24 (concluding that trial court did not abuse its discretion by finding that cases involved common core of facts and by refusing to view lawsuit as series of discrete claims such that hours expended could be divided and compensated on claim-by-claim basis); cf. *Human Rights Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 251, 668 A.2d 659, 669 (1995) (stating that, in considering reasonable amount of attor-

ney's fees, hours spent on claims "distinct in all respects" from successful claims should be excluded, but fee awards should not be reduced simply because plaintiff failed to prevail on every claim in lawsuit (quotation omitted)).

¶ 20. Similarly, the trial court did not abuse its discretion by declining to reduce the attorney's fee award based on Walsh's unsuccessful attempt to keep Good Stuff in the case. Walsh's expert testified that it would have been malpractice for Walsh's attorney not to seek to add Good Stuff as a defendant, given the circumstances of the case, and the trial court itself acknowledged that its decision to dismiss Good Stuff from Walsh's lawsuit was a close question that could go either way on appeal. Further, Good Stuff consisted of two persons, Cluba and a partner who, as Walsh pointed out, directed Good Stuff's move out of Walsh's premises and would have been deposed and called as a witness even if Walsh had not sought to make Good Stuff a defendant in the lawsuit.

¶ 21. ■ ■ We also reject Cluba's argument that the attorney's fee award must be reduced because of the 4-1 proportion between the attorney's fees awarded and the compensatory damages awarded by the jury. "An attorney does not receive a 'windfall' merely because the award of attorney's fees is not proportionate to the award of damages." *L'Esperance*, 2003 VT 43, ¶ 27. The ultimate question "is not whether the attorney's fee award is proportional to the damages, but rather whether the fee award is reasonable given the demands of the case." *Kwon*, 2010 VT 73, ¶ 20. Here, the trial court found that both sides litigated this case vigorously, and Walsh's expert, whom the trial court obviously found to be credible, testified that Walsh's attorney acted reasonably in litigating the case. See *L'Esperance*, 2003 VT 43, ¶ 28 (stating that credibility and weight given to expert's testimony on reasonableness of attorney's fees "were determinations committed to the trial court's discretion, not ours"). On the record before us, we cannot conclude that the trial court abused its discretion by awarding Walsh attorney's fees in an amount four times the damages award. Cf. *Kwon*, 2010 VT 73, ¶¶ 21-22 (upholding $18,975 attorney's fee award to tenants who were awarded $4929 in damages); *Vastano v. Killington Valley Real Estate*, 2010 VT 12, ¶¶ 9-10, 187 Vt. 628, 996 A.2d 170 (mem.) (upholding $55,012 attorney's fee award even though prevailing party obtained comparatively low damage award of $7875).

¶ 22. We now turn to Walsh's cross-appeal issues. Walsh first argues that the trial court erred by dismissing his contractual claims against Good Stuff in its January 12, 2012 decision granting defendants' motion for partial summary judgment. In that decision, the trial court rejected Walsh's theory of successor liability, distinguishing the cases cited by Walsh, apparently based on the fact that there was no predecessor corporate entity for Good Stuff to succeed in this case. Cf. *Gladstone v. Stuart Cinemas, Inc.*, 2005 VT 44, ¶ 35, 178 Vt. 104, 878 A.2d 214 (reversing trial court's summary judgment ruling of no successor liability in case involving purchase of one corporation by another); *Cab-Tek, Inc. v. E.B.M., Inc.*, 153 Vt. 432, 437, 571 A.2d 671, 673 (1990) (concluding that trial court did not err in finding successor liability based on de facto merger of two corporations). The court also ruled that Walsh had abandoned its theory — initially argued in his motion to amend his complaint — that Good Stuff could be found liable based on it having ratified the lease after it was signed by Cluba acting as its agent. The court declined to consider the argument on the basis that it had neither been briefed nor supported by evidentiary material in Walsh's response to defendants' motion for summary judgment.

¶ 23. Walsh asserts that successor liability is "quite akin" to ratification, and that, in any event, he did not abandon the ratification theory, as evidenced by his stating (1) in his amended complaint that Good Stuff had ratified execution of the lease, and (2) in his statement of undisputed material facts that Good Stuff was bound by the lease agreement because Cluba signed the lease as its agent and Good Stuff collected all revenue from the business and paid Cluba's salary. We do not find these arguments persuasive.

¶ 24. On appeal, Walsh is essentially reviving his abandoned ratification argument. Indeed, in his appellate brief, Walsh relies principally on cases that he cited in his motion to amend his complaint to add Good Stuff as a defendant. Walsh did not cite those cases, however, in responding to defendants' motion for summary judgment, in which defendants asserted that Walsh knew he was contracting solely with Cluba, made no attempt to bind Good Stuff to the lease agreement, and could not produce any admissible evidence that Good Stuff ever ratified the agreement. Instead, Walsh relied solely on a theory of successor liability. Moreover, in the second amended complaint in which

Walsh added his negligence claim, Walsh dropped his claim that Good Stuff "subsequently ratified the execution of the Lease" and instead claimed that Good Stuff "subsequently occupied the premises along with the Defendant Cluba and jointly operated a retail business therein."

¶ 25. ■■ ■ Tellingly, after the trial court's rejection of that theory and its refusal to consider the ratification theory based on Walsh having abandoned it, Walsh filed a motion to clarify in which he did not dispute either the court's rejection of his successor liability theory or its refusal to consider his abandoned ratification theory. Rather, Walsh asked the court to keep Good Stuff in the case based on a negligence theory of liability, which the court ultimately rejected based on the economic-loss rule. In short, with respect to Good Stuff, Walsh made the tactical decision to abandon his contractual claims and instead rely on a negligence claim of liability. He now seeks to backtrack from that strategy by claiming on appeal that the trial court erred in not addressing his ratification theory — even though he pointedly did not challenge the trial court's ruling below in his motion to clarify. On this record, we decline to consider the argument. See *Beyel v. Degan*, 142 Vt. 617, 619, 458 A.2d 1137, 1138 (1983) (stating that party who fails to object to trial court ruling and proceeds to trial cannot later claim error in ruling on appeal); cf. *Pinewood Manor, Inc. v. Vt. Agency of Transp.*, 164 Vt. 312, 320, 668 A.2d 653, 659 (1995) (stating that party sufficiently apprised trial court of its claim of error and adequately preserved the claim for review on appeal by filing motion to amend).

¶ 26. Walsh's second cross-appeal argument is that the trial court erred by dismissing his negligence claim against Good Stuff based on the economic-loss rule. At the close of plaintiff's case, defendants moved for judgment as a matter of law under Vermont Rule of Civil Procedure 50 with respect to the remaining negligence claim against Good Stuff. Following argument by counsel, the trial court granted the motion, ruling that the economic-loss rule barred the negligence claim because the relationship between the parties was entirely occupied and defined by the lease agreement. On appeal, Walsh argues that the court erred in barring his negligence claim against Good Stuff based on the economic-loss rule because: (1) he was claiming property damage, in addition to economic loss, as the result of Good Stuff's actions; and (2) in any event, he had a special landlord-tenant relationship

with Good Stuff that warranted exemption from the economic-loss rule.

¶ 27. ▮ The economic-loss rule "maintain[s] a distinction between contract and tort law" by "prohibit[ing] recovery in tort for purely economic losses." *Long Trail House Condo. Ass'n v. Engelberth Constr., Inc.*, 2012 VT 80, ¶ 10, 192 Vt. 322, 59 A.3d 752 (quotation omitted); see *Wentworth v. Crawford & Co.*, 174 Vt. 118, 127, 807 A.2d 351, 357 (2002) ("[O]ur caselaw prohibits a claimant from seeking damages for contractual losses through tort law."). Tort law imposes duties to protect the public from harm, and thus negligence actions are generally limited to unanticipated physical injury, while contract law allows parties to protect themselves through bargaining. *Long Trail*, 2012 VT 80, ¶ 10; *Springfield Hydroelectric Co. v. Copp*, 172 Vt. 311, 314, 779 A.2d 67, 70 (2001) (stating "that negligence actions are best suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident," while contract actions "are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement" (quotation omitted)). The determining factor in deciding whether to apply the economic-loss rule is not whether privity exists but rather whether there is "a duty separate and apart from a contractual duty." *Long Trail*, 2012 VT 80, ¶ 13.

¶ 28. ▮ "Negligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm." *O'Connell v. Killington, Ltd.*, 164 Vt. 73, 77, 665 A.2d 39, 42 (1995). The physical harm may be to property rather than persons, but injury to the product or property that is the subject of a contract is generally considered a disappointed economic expectation for which relief lies in contract rather than tort law. See *E. River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 871 (1986) (holding that no products liability claim lies in admiralty when commercial party alleges injury only to product itself, resulting in purely economic loss, insofar as "[t]he tort concern with safety is reduced when an injury is only to the product itself"); see also *Paquette v. Deere & Co.*, 168 Vt. 258, 260, 719 A.2d 410, 412 (1998) ("Some jurisdictions have allowed recovery for damage to the product itself, though most often only if the loss occurred in the context of a dangerous situation such as an

accident."); cf. *Long Trail*, 2012 VT 80, ¶ 11 (stating that remedy for economic losses such as cost of repair resulting from construction defects sounds in contract rather than tort). Thus, with respect to property damage, the economic-loss rule generally applies to bar tort claims when the alleged damage is to property that is the subject of a contract between the parties. Cf. *Valley Forge Ins. Co. v. Sam's Plumbing, LLC*, 207 P.3d 765, 767-68 (Ariz. Ct. App. 2009) (refusing to apply economic-loss rule to bar tort action in which plumbing contractor's alleged negligence caused damage not only to gas lines that were subject of contract with commercial tenant but also to other parts of landlord's shopping mall); *Comptech Int'l v. Milam Commerce Park, Ltd.*, 753 So. 2d 1219, 1226 (Fla. 1999), *modified by Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013) (refusing to apply economic-loss rule where damage to commercial tenant's computers caused by alleged negligence of contractor hired by landlord to renovate leased space constituted damage to property other than warehouse itself, which was subject of lease agreement).[1]

¶ 29. ■■ ■ Here, Walsh sought damages to his commercial property that was the subject of the lease agreement between him and his tenant, Cluba. The agreement specifically addressed the contractual remedy for any damage to the property resulting from Cluba's lease of the property. The agreement provided that fixtures could be removed before the tenant vacated the premises as long as the tenant immediately repaired any damage caused by removal of the fixtures and that their removal did not cause

---

[1] The dissent suggests that the "other property" rule has no application in cases other than products liability claims, and posits an actionable duty in tort to prevent economic losses with respect to the subject of the contract. The decisions cited above did not involve such claims, but nonetheless suggest that the economic-loss rule would have applied to preclude tort claims if the damage had been solely to the leased premises itself rather than to other property contained within the leased premises. On the other hand, the dissent does not cite any cases in which a court refused to apply the economic-loss rule in situations where there were contract and tort claims concerning damage only to the leased premises. Cf. 3 D. Dobbs, et al., The Law of Torts § 615, at 495 (2d ed. 2011) (stating that although economic-loss rule generally covers "only stand-alone economic loss, not property damage, some courts have insisted that even when the defendant damages the plaintiff's tangible property, the plaintiff who has some kind of contractual relationship with the defendant has no negligence claim," particularly "when the defendant has damaged or refused to return the plaintiff's bailed property").

substantial damage to the premises. The agreement also stated that in the event of a default by the tenant, the tenant would be required to pay the landlord all expenses incurred in repossessing the property and getting the property in good order so that it could be re-rented. Good Stuff occupied the property as the result of Cluba being its president and director and having signed the lease with Walsh. Thus, although Walsh and Good Stuff were legal strangers, any duty Good Stuff had concerning the subject property was established by virtue of the lease agreement. Under these circumstances, the trial court did not err in dismissing Walsh's negligence claim based on the economic-loss rule. See *Springfield Hydroelectric Co.*, 172 Vt. at 314, 779 A.2d at 70 ("As our caselaw makes clear, claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract.").

¶ 30. Walsh's argument that he had a "special relationship" with Cluba that precludes application of the economic-loss rule is misplaced. The question is whether the nature of the relationship — most often a professional relationship such as doctor-patient or attorney-client — is such that it "automatically triggers[s] an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000); see *Springfield Hydroelectric Co.*, 172 Vt. at 316-17, 779 A.2d at 71-72 (discussing professional services subject to special relationship exception to economic-loss rule). Here, no such professional relationship exists. Nor did Good Stuff enter into a contract with Walsh, although any duty as a tenant not to damage the leased property arises from the contract signed by Cluba and Walsh.

¶ 31. ▮▮▮ Walsh does not argue that, in the event we uphold the trial court's dismissal of his contractual claims against Good Stuff, the lack of privity between him and Good Stuff precludes application of the economic-loss rule.[2] Rather, the only bases that he

---

[2] Apart from Walsh's arguments, the dissent provides its own basis for why we should not apply the economic-loss rule in this case — Good Stuff had an independent tort duty under the common law not to damage or lay waste to plaintiff's property. In so reasoning, the dissent relies primarily on a decision by the Washington Supreme Court holding that "the duty to not cause waste is a tort duty that arises independently of a lease agreement" such that "an aggrieved lessor may pursue damages concurrently under theories of tort and breach of lease." *Eastwood v. Horse Harbor Found., Inc.*, 241 P.3d 1256, 1267 (Wash. 2010). But, as a leading treatise has noted, some courts have held that "if the contract

contends preclude application of the economic-loss rule are: (1) the damage to property and (2) his special relationship with Good Stuff. We recognize that the trial court dismissed Walsh's contractual claims against Good Stuff, but the dismissal was based on its determinations that successor liability did not apply and that Walsh had abandoned his ratification theory — determinations that we have upheld on appeal. Walsh's ratification theory, had he not abandoned it, may have ultimately been successful in preserving his contractual claims against Good Stuff. See *Rich v. Chadwick*, 136 Vt. at 124, 385 A.2d at 678 ("[A] subsequently formed corporation may, by accepting the benefits of a contract,

---

sets a duty relevant to the claim, the contract will control even if there would also be a tort duty independent of the claim." 3 Dobbs, *supra*, § 615, at 490. According to the treatise:

> The economic loss rule does not apply to bar the tort claim for economic harms if the defendant breached a duty of care that was independent of the contract. This may occur because the duty did not arise out of the contract and is not intertwined with the contract duty of performance. Phrased differently, the tort duty, to be actionable, must not be "interwoven" with the contract.

*Id.*; see also *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004) ("If we conclude that the duty of care owed by [the parties] was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and the economic loss rule bars the tort claim and holds the parties to the contracts' terms."); *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1108 (Colo. App. 2004) (holding that although defendant president of defendant leasing company did not sign lease in his individual capacity and "could have an independent, well-recognized obligation imposed by tort law to refrain from intentional interference with a prospective business advantage," economic-loss rule barred tenants' tort claim because source of defendants' duty not to interfere with assignment of lease was parties' lease agreement and thus it was improper "to analyze the existence of an independent tort duty in determining whether an economic loss may be recovered"); *Gulfstream Aerospace Servs. Corp. v. U.S. Aviation Underwriters, Inc.*, 635 S.E.2d 38, 45, 47 (Ga. Ct. App. 2006) (concurring with other courts that tort duty is not independent so as to preclude application of economic-loss rule if source of duty stemmed from parties' contract); *Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 53, 70 P.3d 1 (holding that there is no independent tort duty because "the exact same conduct is described in both the contract and tort claims, and the exact same facts and circumstances are at play, [which] is indicative of . . . overlapping duties"). We need not delve into the subtleties of this issue in this case, other than noting that "[t]he key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action." *AZCO Constr.*, 10 P.3d at 1262. Here, the alleged tort duty was plainly interwoven with the subject contract — indeed, the contract was the source of the duty.

470

ratify that contract, even without formal or documented[,] action."). But because Walsh abandoned that theory, he was never able to prove it; as a consequence, he lost his potential contractual claims against Good Stuff. In any event, as noted, the existence of privity is not necessarily the determining factor in whether to apply the rule to bar a tort claim. *Long Trail*, 2012 VT 80, ¶ 13.

¶ 32. ▮▮▮ Given the unique circumstances of this case, the trial court did not err in dismissing Walsh's negligence claim against Good Stuff under the economic-loss rule. See 3 Dobbs, *supra*, § 607, at 463 (stating that no single normative principle underlies economic-loss rule's rejection of many potential claims and that "details and factual contexts are likely to be more compelling than a sweeping rule"). Notwithstanding the dissent's assertion to the contrary and its predictions of dire consequences threatening "the very balance . . . of tort and contract law," we are not adopting in this case a "new approach" to the economic-loss rule. *Post*, ¶ 48. Indeed, dissenters to decisions both applying and refusing to apply the economic-loss doctrine in specific cases have claimed that the decisions will wreak havoc with tort or contract law. See, e.g., *Tiara Condo. Ass'n*, 110 So. 3d at 410, 411 (Polston, C.J., dissenting) (stating that, by limiting application of economic-loss rule, "the majority greatly expands the use of tort law at a cost to Florida's contract law," thereby "seriously undermin[ing]" the latter law); *id.* at 411, 414 (Canady, J., dissenting) (stating that majority's decision "sets a new course for the expansion of tort law at the expense of contract law," which will result in "the prospect of every breach of contract claim being accompanied by a tort claim"). In truth, as noted in the above treatise, the application of the doctrine is highly fact-specific. Our decision today, based on the facts of this case, will not alter the balance of tort and contract law in Vermont, as the dissent predicts.

*Affirmed.*

¶ 33. **Robinson, J.,** concurring and dissenting. The majority expands the so-called economic-loss rule by applying it to claims resting on physical damage to property and by implying a presumptive prospective waiver of tort claims whenever parties assume corresponding contractual duties. In so doing, it misapprehends the rationale for and scope of the rule, further muddying an already confused area of law.

¶ 34. Courts, including this one, have cited "the economic-loss rule" to support a variety of related but nonetheless distinct

propositions.[3] This Court has generally cited the "rule" in support of two related principles — one general, and one more specific. At the general level, the rule "prohibits recovery in tort for purely economic losses" — except when it doesn't.[4] See *Long Trail*, 2012

---

[3] See Restatement (Third) of Torts: Liab. for Econ. Harm § 1 Reporter's Note (Tentative Draft No. 1, 2012) (describing "economic loss" as a "potent source of confusion" within the law of liability for negligence). The economic-loss provisions of the Restatement (Third) of Torts: Liability for Economic Harm cited in this opinion were approved at the 89th Annual Meeting of the American Law Institute. 89th Annual Meeting: 2012 Proceedings, *Discussion of Restatement of the Law Third, Torts: Liability for Economic Harm*, 89 A.L.I. Proc. 22, 46-47 (2012). The A.L.I. states that "[o]nce it is approved by the membership at an Annual Meeting, a Tentative Draft . . . represents the most current statement of the American Law Institute's position on the subject and may be cited in opinions or briefs . . . until the official text is published." Overview, Project Development, Am. Law Inst., http://www.ali.org/index.cfm?fuseaction=projects.main.

[4] I add the "except-when-it-doesn't" caveat because courts have recognized a host of exceptions to this general principle, such that the broad statement quoted above doesn't actually reflect the state of the law. See, e.g., *Long Trail House Condo. Ass'n v. Engelberth Constr., Inc.*, 2012 VT 80, ¶ 13, 192 Vt. 322, 59 A.3d 752 (recognizing that there "might be recovery for purely economic losses in a limited class of cases" involving parties who have "a special relationship, which creates a duty of care independent of contract obligations," such as the obligation to avoid violating a "professional duty") (quotations omitted); *Springfield Hydroelectric Co. v. Copp*, 172 Vt. 311, 316, 779 A.2d 67, 71 (2001) ("[C]ourts have permitted recovery for economic loss" where there is "a special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor." (quotation marks and citation omitted)); see also *Limoge v. People's Trust Co.*, 168 Vt. 265, 268-69, 719 A.2d 888, 890 (1998) (applying Restatement (Second) of Torts § 552(1) (1977) and recognizing that one who, in the course of his or her business, fails to exercise reasonable care and supplies false information for the guidance of others in their business transactions "is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information").

Because of the plethora of exceptions to the broad formulation of the economic-loss rule, the Restatement (Third) of Torts: Liability for Economic Harm articulates "a more limited principle: not that liability for economic loss is generally precluded, but that duties of care with respect to economic loss are not general in character; they are recognized in specific circumstances." § 1 cmt. b ("Stating the absence of a duty as a general rule can create confusion by seeming to threaten well-established causes of action, by leaving behind an uncertain and unwieldy number of exceptions, and by implying a needless presumption against the existence of a duty on facts not yet considered. The rule of this Section creates no such presumption. It merely means that duties to avoid causing economic loss require justification on more particular grounds than duties to avoid causing physical harm.").

VT 80, ¶ 10 (quotation omitted); see also *Gus' Catering, Inc. v. Menusoft Sys.*, 171 Vt. 556, 558, 762 A.2d 804, 807 (2000) (mem.) ("Negligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm, which does not include economic loss." (alterations and quotation omitted)).

¶ 35. Significantly, as this Court has long recognized, the "economic losses" to which the economic-loss rule applies are *intangible* economic losses, and do not include losses accompanying physical harm to persons or property. See *Long Trail*, 2012 VT 80, ¶ 10 (" 'negligence actions are limited to those involving unanticipated *physical injury*' " (emphasis added) (quoting *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 30, 181 Vt. 513, 928 A.2d 497)); *Glassford v. BrickKicker*, 2011 VT 118, ¶ 41, 191 Vt. 1, 35 A.3d 1044 ("When, as here, *economic loss without physical injury* is claimed by plaintiff, the obligation of defendant is governed by the contract terms, and not the law of negligence." (emphasis added)); *Wentworth v. Crawford & Co.*, 174 Vt. 118, 126, 807 A.2d 351, 356 (2002) ("*absent some accompanying physical harm*, there is no duty to exercise reasonable care to protect another's economic interests" (emphasis added)); *Springfield Hydroelectric*, 172 Vt. at 314, 779 A.2d at 70 ("[N]egligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another *unless one's conduct has inflicted some accompanying physical harm.*") (emphasis added) (quotation omitted); Restatement (Third) of Torts: Liab. for Econ. Harm § 2 (" '[E]conomic loss' is pecuniary damage *not arising from injury to the plaintiff's person or from physical harm to the plaintiff's property.*" (emphasis added)).

¶ 36. A more specific corollary to the general rule articulated above is that the assumption of a *contractual* duty does not give rise to a *tort* duty to prevent economic losses with respect to the subject of the contract. *Long Trail*, 2012 VT 80, ¶ 10 (" '[C]laimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract.' " (quoting *EBWS*, 2007 VT 37, ¶ 30)); *Wentworth*, 174 Vt. at 127, 807 A.2d at 357 ("[O]ur caselaw prohibits a claimant from seeking damages for contractual losses through tort law."); Restatement (Third) of Torts: Liab. for Econ. Harm § 3 ("Except as provided elsewhere in this Restatement, there is no liability in tort for economic loss caused by negligence

in the performance or negotiation of a contract between the parties."). We have sometimes said that the economic-loss rule "serves to maintain a distinction between contract and tort law." *Long Trail*, 2012 VT 80, ¶ 10.

¶ 37. However, it is not the law, and we have never previously held, that a person cannot have simultaneous duties in tort and contract covering the same subject matter. The existence of a contractual duty does not *give rise* to a tort duty to prevent economic losses where such a duty does not otherwise exist, but neither does it as a matter of law *negate* an independent tort duty. As we have previously recognized, "[t]he underlying analysis turns on whether there is 'a duty of care *independent* of any contractual obligations.' "[5] *Springfield Hydroelectric*, 172 Vt. at 316, 779 A.2d at 71 (quoting *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000)).[6]

¶ 38. To be sure, contracting parties may agree in advance to limit the remedies available for a party's negligence in tort, but it takes more than contract provisions establishing overlapping contract duties to effect such a waiver or limitation. First and foremost, courts will not enforce an exculpatory agreement unless the language effectuating the waiver is clear. We have explained that "courts have traditionally disfavored contractual exclusions of negligence liability," and accordingly "have applied more exacting judicial scrutiny when interpreting this type of contractual provision." *Colgan v. Agway, Inc.*, 150 Vt. 373, 375, 553 A.2d 143, 145 (1988). "[A] greater degree of clarity is necessary to make [an] exculpatory clause effective than would be required for other types of contract provisions," and such clauses "must be construed strictly against the part[y] relying on them." *Id.* (emphasis omitted). Accordingly, "contractual language disclaiming tort liability [must] be clear enough that the intent of both parties to relieve the defendant of the claimed liability [is] unmistakable." *Id.*

---

[5] Because the "economic loss rule" phrase "has proved to be a misnomer," at least one state has rejected that label, now referring instead to the "independent duty doctrine," a "more apt term." *Eastwood v. Horse Harbor Found., Inc.*, 241 P.3d 1256, 1261, 1268 (Wash. 2010).

[6] The majority recognizes this, *ante*, ¶ 31 n.2, but then departs from this framework, embracing the view that an agreement that establishes a contractual duty to take or refrain from taking certain actions displaces or overrides a pre-existing and independent tort duty with respect to the same subject matter. See *ante*, ¶¶ 28-30.

¶ 39. We have explained that "[t]he most effective way for parties to express an intention to release one party from liability flowing from that party's own negligence is to provide explicitly that claims based in negligence are included in the release." *Id.* at 376, 553 A.2d at 146. In *Colgan*, we concluded that broad exculpatory language at the end of a limited warranty clause was insufficient to shield the defendant from liability for negligent design. Compare *id.* at 376-77, 553 A.2d at 146, with *Douglass v. Skiing Standards, Inc.*, 142 Vt. 634, 635-37, 459 A.2d 97, 97-99 (1983) (holding that agreement, viewed in its entirety, was sufficiently clear to show that experienced, professional skier intended to hold ski area harmless).

¶ 40. In addition, we have recognized that "[e]ven well-drafted exculpatory agreements . . . may be void because they violate public policy." *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 332, 670 A.2d 795, 797 (1995); see also *Glassford*, 2011 VT 118, ¶¶ 17-30 (evaluating substantive provisions of contract and circumstances surrounding its execution in concluding that contract effectively limiting liability was void as against public policy).

¶ 41. Turning to this case, in his second amended complaint Walsh alleged that "[i]n the process of vacating the premises, the Defendants negligently damaged them quite extensively which inhibited the Plaintiff from reletting the premises for some time, while repairs were made." Walsh sought a judgment that "the Defendants are liable for the cost of repairing the damages to the Lease Premises negligently inflicted by them, the loss of rentals during the period of repair, and other consequential damages resulting therefrom."

¶ 42. At trial, Walsh supported these allegations with evidence that defendants left holes in the sheetrock, including a major hole, such that the sheetrock had to be replaced; altered the windows by removing or damaging surrounding molding or trim; destroyed the heating units, necessitating replacement; failed to put sheetrock up in Unit 8 after (with Walsh's consent) removing a bathroom in Unit 6 to make room for a stairway to connect two units; damaged light switches and an electric-outlet plate; left dangling electric wires which had to be removed and capped by an electrician; caused several hundred dollars' worth of damage to ceiling tiles; broke the thermostat and left it dangling; and damaged the doorframe and latch such that Walsh had to replace them.

¶ 43. In affirming the dismissal of Walsh's claims on the basis of the economic-loss rule, the majority makes two significant missteps. First and foremost, it has invoked the rule in a setting in which the plaintiff is not seeking damages for purely economic losses. Walsh's allegations and the above evidence clearly support a claim for damage to his property. This simply isn't an "economic-loss" case, in which a plaintiff is seeking a tort remedy for a purely economic loss. For that reason, the economic-loss rule should pose no obstacle to Walsh's claims. The fact that, in addition to the costs of repairing the damaged property, Walsh seeks a judgment for the loss of rental income during the repair period does not change the character of his claim or convert it into a claim for purely economic losses. He does not seek damages for "economic loss without physical injury," *Glassford*, 2011 VT 118, ¶ 41, or "absent some accompanying physical harm." *Wentworth*, 174 Vt. at 126, 807 A.2d at 356. See also Restatement (Third) of Torts: Liab. for Econ. Harm § 2 cmt. a ("Economic loss that accompanies even minor injury to the plaintiff's person or property" does not fall into the category of pecuniary losses subject to the economic-loss rule.). On this basis alone, I would reverse the trial court's decision.

¶ 44. The majority recognizes that this case involves harm to property, but asserts that "injury to the product or property that is the subject of a contract is generally considered a disappointed economic expectation for which relief lies in contract rather than tort law." *Ante*, ¶ 28. This general statement has everything to do with products liability and construction cases, and nothing to do with a case like this. The primary case relied upon by the majority, *East River Steamship Corp. v. Transamerica Delaval Inc.*, involved ship turbines which failed due to design and manufacturing defects. 476 U.S. 858, 859-61 (1986). No other property was damaged as a result of the failures, but the economic expectations of the companies that chartered the affected ships were frustrated. *Id.* at 861-62. The question presented to the Court was whether the defective turbines could support a claim in tort for products liability. The Court noted that "when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service." *Id.* at 871. The Court concluded that "[d]amage to a product itself is most naturally

understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.' " *Id.* at 872 (citation omitted). The Court's conclusion reflects a specific application of the general principle that, with a host of exceptions, a person has no duty in tort to protect another against purely economic harms, and of the more particular principle that the fact of a contract between the parties does not give rise to a tort duty where such a duty does not otherwise exist. The same is true in construction cases in which a party contracts to build something for another: in the absence of an independent tort duty, the fact of a contract does not give rise to a tort duty on the part of the builder to avoid purely economic harms to others resulting from negligent construction. *Long Trail*, 2012 VT 80, ¶ 11.

¶ 45. The leased premises in this case are in no way akin to the defective product in *East River Steamship* or the defectively constructed condominium in *Long Trail*. As the Florida Supreme Court noted in connection with a similar issue, "[h]ad the courts adhered to [the *East River*] requirements (a product, the product damaging itself, and economic losses), the confusion that has abounded in this area of the law would have been minimized." *Comptech Int'l, Inc. v. Milam Commerce Park, Ltd.*, 753 So. 2d 1219, 1224 (Fla. 1999), *modified by Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013). Although the leased premises in this case were "the subject of a contract" in a colloquial sense, the damage alleged here was not in any sense a mere frustration of the goals and purposes of the contract. Walsh did not hire defendants to repair the space in question; he leased it to them for their commercial use. The damage here was the product of a breach of a duty independent from — indeed, having nothing to do with — the contract or obligations arising solely from that contract. A builder has no obligation to build a building that doesn't collapse except to the extent that someone contracts with that builder to do so. In the absence of any other injury to person or property, a manufacturer's obligation to provide a widget that does not blow itself up arises only from the manufacturer's warranty. By contrast, any person walking off the street, with no obligations based in a lease and no relationship to another entity with obligations based in a lease, would be similarly liable for negligently damaging the premises at issue here.

¶ 46. That leads to the second flaw in the majority's analysis. Rather than considering whether, independent of the contract, Walsh has alleged a breach of a cognizable tort (or other) duty by defendants, and, in turn, whether the contract then limits that duty, the majority concludes that because the parties executed a contract with provisions imposing a duty on defendants with respect to the condition of the leased premises, no tort duty exists. In doing so, the majority falls into the very trap criticized in the treatise upon which it relies:

> The principle that respects the parties' private ordering is to some extent undermined when courts assume, without analyzing the contract, that the contract has allocated risks on the matter in dispute. In addition, some courts have applied the contract version of the economic loss rules much more broadly than the core idea suggests. For example, courts may exclude the tort claim because the contract imposes a duty that is the same as or similar to the duty imposed by an independent tort rule. *Courts may also exclude the tort claim that arises from an independent tort duty if the tort claim deals with the same "subject matter" covered by the contract,* or is "interwoven" with the contract, or even when the tort claim merely arises from the same set of facts as the contract claim. Professor Johnson has carefully criticized these broad approximations. It is possible that fine-tuning over-broad statements will come as case law develops with more attention to effectuating the parties' intent in contracting.

3 D. Dobbs, et al., The Law of Torts § 613, at 480-81 (2d ed. 2011) (emphasis added) (footnotes omitted). The same treatise explains:

> Where a contract creates a special relationship between the parties, such as a status like lawyer and client, the duties arising from the relationship may often be enforced in tort, not merely in contract. *However, according to some authority, if the contract sets a duty relevant to the claim, the contract will control even if there would also be a tort duty independent of the claim.*

*Id.* § 615, at 490 (emphasis added) (footnote omitted). The statement from Dobbs upon which the majority relies in characterizing

the law on this point, *ante*, ¶ 31 n.2, thus does not reflect the majority or preferred view, but rather represents the treatise's acknowledgment that some courts have departed from the general approach described in the treatise with respect to cases in which tort duty arising from a "special relationship" exists even with respect to solely economic losses.

¶ 47. In this case, the provision of the parties' lease agreement apparently relied upon by the majority provides that tenant owns and may remove all furniture, machinery, and equipment used during the lease, provided that the removal does not cause substantial damage to the premises, and provides that fixtures installed by the tenant that cannot be removed without causing permanent damage to the interior of the leased premises shall become property of the landlord. The provision does not purport to supersede and replace all existing tort duties including those duties relating to the alleged holes in the sheetrock, damage to the window trim, destruction of the heating units, failure to replace sheetrock after removing a bathroom, damage to light switches and an electric-outlet plate, dangling electric wires, a broken thermostat, and damage to the doorframe and latch. It is not at all clear that all, or even most, of this damage was directly tied to the removal of furniture referenced in the lease agreement.

¶ 48. By concluding that this contract provision relating to fixtures essentially wipes out the tort duties of a third party with respect to property damage more broadly, the majority shifts from a rule that recognizes that a contractual duty does not give birth to a tort duty to avoid purely economic losses to a rule that presumes that a contractual duty negates any pre-existing, independent tort duty concerning the same subject matter. This approach turns the analysis on its head and bypasses the proper threshold question — "Is there a duty here independent of the contract?" The resulting rule embraced by the majority is not a logical corollary of the economic-loss rule in either its general or more specific expression, but represents a new approach that upends the very balance between the respective and sometimes overlapping domains of tort and contract law that the economic-loss rule is supposed to protect. It also sidesteps the rigorous review this Court applies to exculpatory clauses in contracts.

¶ 49. Wholly apart from any lease agreement, defendants here had a well-established duty not to unreasonably damage Walsh's premises. It is black-letter tort law that "[a]n actor whose

negligence is a factual cause of physical harm is subject to liability for any such harm" unless an exception applies. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 6 (2010). "Physical harm" includes "the physical impairment of . . . real property or tangible personal property ('property damage')." *Id.* § 4. Regardless of whether they were parties to the lease agreement, or whether there even was a lease agreement, defendants in this case had a common-law tort duty not to negligently damage Walsh's property. The economic-loss rule is not an obstacle to Walsh's claim based on this common-law duty — both because, by definition, the economic-loss rule does not apply to claims for property damage, and because the duty on which Walsh's claim is based exists wholly independent of the lease agreement.

¶ 50. Moreover, as occupiers of Walsh's premises, both defendants had a well-established common-law duty to avoid waste. In *Turgeon v. Schneider*, we approved a trial court's instruction that while the tenants lawfully possessed a farm, "they had a duty to take care of the farm and the equipment therein and return it to [landlords] in substantially the same condition as when their occupancy began, reasonable wear and tear excepted." 150 Vt. 268, 277, 553 A.2d 548, 553-54 (1988). The approved instruction further provided that if the jury found damage "they must also, in order to find defendants liable, find that it was caused by defendants either by destruction, misuse, alteration or neglect." *Id.*

¶ 51. We examined this duty most recently in the case of *Prue v. Royer*, in which we explicitly defined waste to include repairable as well as irreparable damage to property. 2013 VT 12, ¶ 65, 193 Vt. 267, 67 A.3d 895. In that case, we affirmed the trial court's finding that plaintiffs' neglect of the property constituted waste because it "constituted a substantial injury to the property," even though the property could be repaired to avoid a permanent diminution of property value. *Id.*

¶ 52. Significantly, like the more general duty of reasonable care with respect to another's property, the duty not to commit waste does not depend on a contract directly with a landlord; rather, it arises from the lawful possession of property. The Restatement (Second) of Property provides the following illustration:

> L leases commercial property to T. T subleases the premises for part of the remainder of the term to S. During his occupancy, S causes substantial damage to the

premises. S has violated his obligation to T not to make changes in the leased property. *If S's conduct has damaged L's reversionary interest in the leased property, S is liable to L for that damage.*

Restatement (Second) of Property: Landlord & Tenant § 12.2, illus. 19 (1977) (emphasis added).[7]

¶ 53. Moreover, nothing in the lease agreement suggests that Walsh has contracted away his legal protections with respect to common-law negligence or waste — as to Cluba individually as a party to the contract, or to Good Stuff as some sort of third-party beneficiary. The most pertinent provision of the lease agreement simply provides: "The tenant agrees . . . at the termination of this lease to surrender the premises in the same condition as at the commencement hereof, reasonable wear and tear excepted." Nowhere in the lease agreement does Walsh implicitly or explicitly waive his common-law remedies for waste with anything approaching the degree of clarity and specificity we have consistently required for an effective exculpatory release.

¶ 54. On the basis of the above considerations, I would join those courts that have allowed a claim for purely economic loss (which this is not) based on allegations of waste by tenants, notwithstanding the existence of a contract covering overlapping duties. The Supreme Court of Washington considered a similar issue in *Eastwood v. Horse Harbor Foundation.* In that case, a commercial landlord of a horse farm sued the tenant, a nonprofit corporation, as well as its employee and its board of directors for breach of the lease, commission of waste, and negligent breach of a duty not to cause physical damage to the leasehold. 241 P.3d at 1259. The intermediate appellate court concluded that the landlord was limited to contractual remedies for the damage done to her

---

[7] Although the discussion of waste is found in the Restatement (Second) of Property, rather than the Restatement of Torts, the duty not to cause waste is frequently characterized as a tort duty. Whether we describe the duty to avoid waste as a duty in tort or as a common-law property duty, it is independent from contract. See, e.g., Restatement (Third) of Property (Mortgages) § 4.6 cmt. a (1997) ("Waste does not depend on the presence of covenants in the mortgage. It is in the nature of a tort, a breach of a duty arising from the mortgage relationship," although "the parties may insert covenants in the mortgage refining or expanding the definition of waste."); 8 R. Powell, Powell on Real Property ¶ 56.01, at 56-3 (M. Wolf ed. 2007) ("The law of waste can be considered as a part of the law of torts, because it considers wrongful and actionable conduct and the available remedies for such wrongs.").

horse farm by the lessee, and that the individual defendants could not be individually liable for the damages. *Id.* at 1260. The Washington Supreme Court reversed, explaining that "[t]he term 'economic loss rule' has proved to be a misnomer. It gives the impression that this is a rule of general application and any time there is an economic loss, there can never be recovery in tort." *Id.* at 1261. The court rejected as overly broad a statement that economic losses cannot be recovered in tort, noting that such a formulation pulls too many types of injuries into the orbit of the economic-loss rule. *Id.*

¶ 55. Listing a host of causes of action — such as wrongful interference with contractual relations, breach of an agent's fiduciary duty to act in good faith, wrongful discharge in violation of public policy, failure of an insurer to act in good faith, and fraudulent concealment — the court concluded that "the fact that an injury is an economic loss or the parties also have a contractual relationship is not an adequate ground, by itself, for holding that a plaintiff is limited to contract remedies." *Id.* Instead, "[a]n injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." *Id.* at 1262. The court held that because the duty not to cause waste arises independently of the lease agreement, the landlord's claims were not barred by the economic-loss rule, and the individual defendants could be liable for the tort of waste. *Id.* at 1266-67; see also *Serfecz v. Jewel Food Stores, Inc.*, 1998 WL 142427, at *1-5 (N.D. Ill. Mar. 26, 1998) (concluding that because commercial tenants had common-law "extracontractual duty" to avoid committing waste, economic-loss rule did not preclude a claim for economic loss arising from the tenants' waste).

¶ 56. For the above reasons, I respectfully dissent from the majority's holding with respect to Walsh's counterclaim against defendants for property damage, but concur in all other respects.