**James J. Lillicrap v. Herbert L. Martin, M.D., University Assoc. in Neurology, Inc., J. Bishop McGill, M.D., Warren L. Beeken, M.D., Surgical Associates Foundation, et al.**

[591 A.2d 41]

No. 86-443

Present: Allen, C.J., Peck, Dooley and Mahady, JJ., and Barney, C.J. (Ret.), Specially Assigned

Opinion Filed July 14, 1989

Motion for Reargument Granted January 17, 1990

Present: Allen, C.J., Dooley, Mahady and Morse, JJ., and Barney, C.J. (Ret.), Specially Assigned

Opinion on Reargument Filed March 1, 1991

166

*Richard E. Davis* and *T. Christopher Greene* of *Richard E. Davis Associates, Inc.,* Barre, for Plaintiff-Appellant.

*S. Crocker Bennett II* and *Michael I. Green* of *Paul, Frank & Collins, Inc.,* Burlington, for Defendants-Appellees Martin and University Associates In Neurology.

*Pierson, Affolter & Wadhams,* Burlington, for Defendants-Appellees McGill and Surgical Associates Foundation.

*Robert D. Rachlin* and *Robert B. Luce* of *Downs Rachlin & Martin,* Burlington, for Defendant-Appellee Beeken.

**Mahady, J.** The plaintiff in this medical malpractice case appeals the action of the trial court granting motions for a directed verdict on behalf of all of the defendants. His appeal requires us to determine the applicability of the statute of limitations, 12 V.S.A. § 521, to the facts of this case as well as the constitutionality of the repose provision of the same statute when applied to those facts. We reverse.

## I. *The Facts*

■ In reviewing the trial court's action in directing a verdict for the defendants, we must view the evidence in the light most favorable to the plaintiff, excluding the effect of modifying evidence. *Utzler v. Medical Center Hosp. of Vermont*, 149 Vt. 126, 128, 540 A.2d 652, 654 (1987). So viewed, the record reveals the following course of events.

In 1971, the plaintiff was diagnosed as suffering from regional enteritis, known as Crohn's Disease. As a result of this disease, the plaintiff's ability to absorb vitamin B-12 through his small bowel into his system was impaired. In 1972, a severe obstruction in the small bowel, also a result of plaintiff's Crohn's Disease, was surgically removed by Dr. McGill. This resection, in turn, further reduced the plaintiff's ability to absorb vitamin B-12.

Accepted standards of medical care required that the plaintiff be informed following such surgery that he must take injections of vitamin B-12 for the rest of his life or until such time as tests demonstrate he is able to absorb sufficient amounts of the vitamin. A failure to take the vitamin under such circumstances can lead to neurological damage, including paralysis and death. At the time of plaintiff's discharge from the surgery, plaintiff's physician, Dr. Beeken, said nothing to the plaintiff about vitamin B-12; Dr. McGill prescribed vitamin B-12, but he also told the plaintiff to take it until he felt better and that the vitamin would not be needed after that time. In 1975, the plaintiff reported that he was indeed feeling better, and he was advised by Dr. McGill to discontinue the injections of vitamin B-12. He did so.

Neurological symptoms can be expected to appear anywhere from two to five years after the cessation of B-12 injections. In 1978, the plaintiff exhibited paresthesia, and he was examined by Dr. McGill, who referred him to Dr. Martin. Dr. Martin concluded that the plaintiff's symptoms (dizziness, clumsiness, numbness and tingling of the extremities) were psychosomatic and advised the plaintiff to take a vacation.

From 1978 to 1980, the plaintiff's wife contacted Dr. McGill on a number of occasions. She was repeatedly reassured that the plaintiff's symptoms were the result of his work habits and tension. By July of 1980, however, the plaintiff was barely able

to walk. Following tests which showed a low-normal level of B-12, Dr. McGill prescribed a resumption of the B-12 injections. In October of 1980, Dr. Martin diagnosed the plaintiff's disease as multiple sclerosis and advised the plaintiff to discontinue the B-12.

The plaintiff followed this advice. Within a month, he was unable to walk and was hospitalized. Tests performed in early December of 1980 disclosed that the plaintiff was still absorbing vitamin B-12 at an abnormally low rate. Dr. Martin wrote to the plaintiff on December 12, 1980, indicating that "our best diagnosis at this time [is] that you [are] B-12 deficient," and advised the plaintiff to "take 1,000 micrograms of Vitamin B-12 by injection every two weeks." However, Dr. Martin also wrote, "I am not prepared to say that we have a final diagnosis even now . . . . Dr. Beeken's group insists that your neurological condition is not related to your Crohn's disease. In fact, I found no literature to support this possibility either." He concluded that if the plaintiff were B-12 deficient, he would be "in a fairly rare group." Subsequently, Dr. McGill told the plaintiff that Dr. Martin "quite possibly . . . feels" that the plaintiff had multiple sclerosis and that it was "quite possible" that the plaintiff did have multiple sclerosis.

In June of 1982, the plaintiff was examined at the Lahey Clinic in Burlington, Massachusetts. On June 25, 1982, he was advised that they could not make a diagnosis of multiple sclerosis. They wrote to the plaintiff that "all of your symptoms and findings can be explained by a deficiency of Vitamin B-12, causing disfunction in the central nervous system, and the trend to slow improvement with B-12 therapy is in keeping with such a conclusion." The plaintiff was advised to continue taking B-12 injections, because his "system apparently is deficient in the ability to assimilate this compound."

On December 10, 1982, the plaintiff commenced this action against Dr. Martin. On December 5, 1983, Dr. Beeken and Dr. McGill were added as defendants. The plaintiff's claim of negligence against Dr. Beeken and Dr. McGill is predicated upon their alleged failure to advise him following the 1972 surgery to take vitamin B-12 injections for life; the claim against Dr. Martin is predicated upon his alleged failure to diagnose the plaintiff's B-12 deficiency in a timely fashion.

Prior to the trial the defendants moved for summary judgment on the ground that the plaintiff's action was barred by the statute of limitations. That motion was denied. In their responsive pleadings, neither Dr. Beeken nor Dr. McGill pled the statute of limitations. On the sixth day of trial, they moved to amend their answer to include this affirmative defense. The trial court allowed the amendment and subsequently directed a verdict in favor of all of the defendants, having concluded that the statute of limitations barred the plaintiff's claims.

## II. *The Amendments*

The plaintiff argues that the trial court abused its discretion when it allowed Dr. Beeken and Dr. McGill to amend their answer on the sixth day of the trial so as to affirmatively plead the statute of limitations.

■ The statute of limitations must be pled as an affirmative defense. V.R.C.P. 8(c); *White Current Corp. v. State*, 140 Vt. 290, 292, 438 A.2d 393, 394 (1981). Otherwise, the defense is waived. See *R. Brown & Sons v. Credit Alliance Corp.*, 144 Vt. 142, 145–46, 473 A.2d 1168, 1170 (1984).

■ Amendments to the pleadings may be allowed with leave of the court at any time. V.R.C.P. 15(a). Whether an amendment should be permitted is an issue addressed to the sound discretion of the trial court. We will reverse the action of the trial court on such rulings only where there is an abuse of discretion. *Bevins v. King*, 143 Vt. 252, 254, 465 A.2d 282, 283 (1983).

■ The trial courts are to be liberal in permitting amendments to the pleadings. V.R.C.P. 15(a). The rationale for this rule has been explained:

> The principal reasons underlying the liberal amendment policy are (1) to provide maximum opportunity for each claim to be decided on its merits rather than on a procedural technicality, (2) to give notice of the nature of the claim or defense, and (3) to enable a party to assert matters that were overlooked or unknown to him at an earlier stage in the proceedings.

*Bevins v. King*, 143 Vt. at 255, 465 A.2d at 283. In short, "[t]he purpose of Rule 15 is to facilitate the disposition of litigation on

the merits and to subordinate the importance of pleadings." 1 R. Field, V. McKusick & L. Wroth, Maine Civil Practice § 15.1, at 301 (2d ed. 1970) (describing the identical Maine rule).

 The record in this case clearly indicates that the trial court exercised its discretion and that it carefully and thoughtfully considered the policy objectives of the rule before doing so. In particular, the court balanced the right of the defendants to present their defense based upon the statute of limitations on its merits, rather than being precluded from doing so because of a procedural technicality, against the right of the plaintiff to be provided with adequate notice of the defense.

Having done so, the trial court concluded that "it would be unjust to the defendants to not permit the limitations defense to be raised at this point," that "the statute of limitations defense has permeated this case from the start," and that the defendants had "forcefully put the plaintiff on notice that [they] intend to rely on the limitation defense."

 These conclusions are well supported by the record. We will not disturb a discretionary ruling of the trial court where that court, as it did here, carefully considered and applied the relevant criteria appropriate to the exercise of its discretion. There was no error in allowing the defendants to amend their pleadings. Nevertheless, we feel constrained to repeat our previous warning that "the practice of filing motions to amend pleadings on the day of trial is clearly to be avoided." *Bevins v. King*, 143 Vt. at 256, 465 A.2d at 284. We would further note that in an appropriate case such motions may be granted subject to terms. *Id.*

### III. *The Statute of Limitations*

#### A.

The defendants claim, and the trial court concluded, that the plaintiff's claims are barred by the relevant statute of limitations:

[A]ctions to recover damages for injuries to the person arising out of any medical or surgical treatment or operation shall be brought within three years of the date of the incident or two years from the date the injury is or reasona-

bly should have been discovered, whichever occurs later . . . .

12 V.S.A. § 521. The plaintiff argues that "the date the injury [was] or reasonably should have been discovered" was June 25, 1982, when the Lahey Clinic provided him with a clear and unequivocal diagnosis.

The plaintiff commenced his action against Dr. Martin on December 10, 1982, and his actions against Dr. Beeken and Dr. McGill on December 5, 1983. Therefore, if the statute of limitations runs from the date of the Lahey Clinic diagnosis as plaintiff claims, those actions would not be barred by the two-year limitation of the statute.

■ The question of when "the injury [was] or reasonably should have been discovered" is one of fact to be determined by the jury. See *Cavanaugh v. Abbott Laboratories*, 145 Vt. 516, 529 n.9, 496 A.2d 154, 162 n.9 (1985). Consistent with this basic principle, a trial court must view the facts in the light most favorable to the plaintiff when passing on a motion for a directed verdict. *Seewaldt v. Mount Snow, Ltd.*, 150 Vt. 238, 239, 552 A.2d 1201, 1201 (1988).

■ Moreover, the trial court must of course apply the correct substantive rules of law. In this case, the trial court determined that the "discovery of the injury" occurred when the plaintiff discovered that he suffered from a neurological disorder ("injury only") not when he also discovered the cause of the disorder ("injury and medical cause"). Accordingly, we must reverse, because the trial court applied the incorrect legal standard and thereby invaded the province of the jury.

B.

On review of the propriety of a [ruling on a motion for] a directed verdict, this Court will view the evidence in the light most favorable to the nonmoving party, exclusive of any modifying evidence. "In so doing we are mindful of the fact that the weight of the evidence, the credibility of the witnesses, and the persuasive effect of their testimony are best left to the determination of the jury and are not to be reviewed by this Court."

*Cushman v. Kirby*, 148 Vt. 571, 574–75, 536 A.2d 550, 552 (1987) (quoting *Currier v. Letourneau*, 135 Vt. 196, 199, 373 A.2d 521, 524 (1977)). "If there [is] any evidence fairly and reasonably supporting [a] claim, the case should [go] to the jury and [a] directed verdict [is] improper." *Senesac v. Associates in Obstetrics & Gynecology*, 141 Vt. 310, 312, 449 A.2d 900, 902 (1982).

These rules reflect the law's recognition that such questions are "to be determined in all doubtful cases by the jury, because the public insists that its conduct be judged in part by the man in the street rather than by lawyers." Prosser and Keeton on the Law of Torts § 37, at 237 (5th ed. 1984).

## C.

The relevant statute required the plaintiff to commence his action "within . . . two years from the date the injury is or reasonably should have been discovered." 12 V.S.A. § 521. This case requires us to interpret the meaning of that provision, an issue which we left open in an earlier decision:

> In the present case, the plaintiff commenced her suit within three years of the date of her discovery of her injury. Therefore, we need not determine whether discovery of an injury is sufficient for accrual, or whether there must be the discovery of the injury *and* of its cause.

*Cavanaugh v. Abbott Laboratories*, 145 Vt. at 526 n.7, 496 A.2d at 160 n.7 (emphasis in original). In this case, the primary issue which faced the trial court concerned at what point the plaintiff discovered or reasonably should have discovered the injury. That court concluded as a matter of law that the plaintiff discovered his injury when he found himself suffering from significant neurological defects in the fall of 1980.

In doing so, the trial judge held that "discovery of the injury," as contemplated by 12 V.S.A. § 521, encompassed only discovery of the injury or illness itself, and not the expanded concept of discovery of the injury or illness plus its cause. Such a position is not without support. See, e.g., *Allen v. Newport*, 427 F. Supp. 42, 44 (M.D. Tenn. 1976); *Layton v. Allen*, 246 A.2d 794 (Del. 1968); *Condon v. A.H. Robins Co.*, 217 Neb. 60, 349 N.W.2d 622 (1984).

However, that position has been criticized by a former chief justice of this Court:

> Doctors hold a special confidential relationship to their patients and possess certain expertise on which the patients are entitled to rely. It would be distasteful for the law to require every patient to question immediately every action by a doctor that results in injury or does not turn out to the patient's liking and then to file a perhaps meritless case merely to preserve possible legal rights.

*Ware v. Gifford Memorial Hosp.*, 664 F. Supp. 169, 171 (D. Vt. 1987) (Billings, J.). The Supreme Court of Utah has likewise reasoned:

> In the health care field it is typically the case that there often is a great disparity in the knowledge of those who provide health care services and those who receive the services with respect to expected and unexpected side effects of a given procedure, as well as the nature, degree, and extent of expected after effects. While the recipient may be aware of a disability or dysfunction, there may be, to the untutored understanding of the average layman, no apparent connection between the treatment provided by a physician and the injury suffered. Even if there is, it may be passed off as an unavoidable side effect or a side effect that will pass with time. Indeed, common experience teaches that one often suffers pain and other physical difficulties without knowing or suspecting the true cause, and may, as often happens, ascribe a totally erroneous cause to the manifestations. Even those who are trained in medical science often require the additional expertise of one possessing specialty training to diagnose properly the cause of certain ailments.

*Foil v. Ballinger*, 601 P.2d 144, 147 (Utah 1979).

The *Ware* court concluded that "a point arises at which a reasonable person should be able to ascertain that her legal rights have been violated. At that point the statute of limitations should commence." 664 F. Supp. at 171. The *Foil* court concluded that "when injuries are suffered that have been caused by an unknown act of negligence by an expert, the law ought not to be construed to destroy a right of action before a person even becomes aware of the existence of that right." 601 P.2d at 147. Put more succinctly, courts ought not "to declare the bread

stale before it is baked." *Fleishman v. Eli Lilly & Co.*, 96 A.D.2d 825, 826, 465 N.Y.S.2d 735, 737 (1983) (Gibbons, J., concurring and dissenting).

The application of traditional limitations analysis caused considerable difficulty where the statute had run before the plaintiff had discovered that he has suffered injury, as is frequently the case in actions for medical malpractice, see, e.g., Lillich, *The Malpractice Statute of Limitations in New York and Other Jurisdictions*, 47 Cornell L. Q. 339 (1962), and in products liability actions involving toxic drugs or chemicals. See, e.g., Note, *The Fairness and Constitutionality of Statutes of Limitations for Toxic Tort Suits*, 96 Harv. L. Rev. 1683 (1983). The "apparent injustice and illogic of this approach," Prosser § 30, at 166, has led to legislative and judicial reforms of which 12 V.S.A. § 521 is but one example. Being remedial in nature, the statute must be construed liberally so as to furnish all the remedy and accomplish all the purposes intended. *State v. Custom Pools*, 150 Vt. 533, 536, 556 A.2d 72, 74 (1988).

One purpose of such reforms was to avoid the unrealistic results of the prior law:

> Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a non-existent railroad. For substantially similar reasons, it has always heretofore been accepted, as a sort of legal "axiom," that a statute of limitations does not begin to run against a cause of action before that cause of action exists, *i.e.*, before a judicial remedy is available to the plaintiff.

*Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir. 1952) (Frank, J., dissenting). Accordingly, the clear trend among the courts of the nation is to hold that the statute does not commence to run until the plaintiff has discovered his "legal injury," such that the statute begins to run only when the plaintiff has or should have discovered both the injury and the fact that it may have been caused by the defendant's negligence or other breach of duty. See, e.g., *Kensinger v. Abbott Laboratories*, 171 Cal. App. 3d 376, 217 Cal. Rptr. 313 (1985); *Mastro v. Brodie*, 682 P.2d 1162 (Colo. 1984); *Raymond v. Eli Lilly & Co.*, 117 N.H. 164, 371 A.2d 170 (1977); *Mant v. Gillespie*, 189 N.J.

Super. 368, 460 A.2d 172 (1983); *Anderson v. Shook*, 333 N.W.2d 708 (N.D. 1983); *McKee v. Williams*, 23 Ohio App. 3d 187, 492 N.E.2d 461 (1985); *Godfrey v. Bick & Monte, P.C.*, 77 Or. App. 429, 713 P.2d 655, *review denied*, 301 Or. 165, 719 P.2d 874 (1986); *Anthony v. Abbott Laboratories*, 490 A.2d 43 (R.I. 1985); *Corder v. A.H. Robins Co.*, 692 S.W.2d 194 (Tex. Ct. App. 1985). Indeed, the United States District Court for the District of Vermont has predicted that we would construe our statute so as to "begin the running of the statute of limitations only when a plaintiff discovers or reasonably should discover the injury, its cause, and the existence of a cause of action." *Ware v. Gifford Memorial Hosp.*, 664 F. Supp. at 171. Today, we join the majority of courts which have recently addressed this issue and so hold.

## D.

The trial court, in applying an "injury only" standard, therefore utilized an incorrect test. If the appropriate standard is used, the evidence taken in the light most favorable to the plaintiff, excluding the effect of modifying evidence, created a genuine issue of fact which must be resolved by a jury.

The trial court's action in directing verdicts in favor of the defendants usurped the function of the jury. Accordingly, a remand is necessary unless the plaintiff's causes of action are precluded by the repose provision of the statute.

### On Reargument

In light of the reargument heard in this case, Part IV of the July 14, 1989 opinion is stricken and a revised version is substituted in its stead. There are no changes in the remaining sections of the opinion, nor in the Court's order.

### IV. *The Repose Provision*

Defendant Warren L. Beeken, M.D., claims that plaintiff's cause of action against him is barred by the repose provision in 12 V.S.A. § 521. Section 521 provides in part that "actions to recover damages for injuries to the person arising out of any medical or surgical treatment or operation shall be brought within three years of the date of the incident or two years from

the date the injury is or reasonably should have been discovered, whichever occurs later, but *not later than seven years from the date of the incident.*" (Emphasis added.) This seven-year period is designated a "repose period." Plaintiff contends that the repose provision is unconstitutional and so does not bar his suit.

The action against Dr. Beeken is based on his alleged failure to advise plaintiff to take vitamin B-12 injections following plaintiff's surgery in 1972. If the repose provision of § 521 is valid and applicable, plaintiff's action against Dr. Beeken is barred, since the negligent treatment occurred more than seven years before the lawsuit against Beeken was filed, in December of 1983. Section 521 contains two exceptions to the repose provision, but neither is applicable in the present circumstances.[1]

Section 521 was enacted in 1978, effective July 1st of that year. 1977, No. 248 (Adj. Sess.). At the time of the alleged malpractice, in 1972, the controlling statute of limitations was 12 V.S.A. § 512, which contained no repose period, but limited actions for injury to the person to "three years after the cause of action accrues." The provision was amended in 1976 to explain that "the cause of action shall be deemed to accrue as of the date of the discovery of the injury." 1975, No. 248 (Adj. Sess.), § 2. Under *Cavanaugh v. Abbott Laboratories,* 145 Vt. at 521–26, 496 A.2d at 160–61, this "discovery" rule is applied retroactively. At the time of defendant's negligent act, therefore, plaintiff had a right to sue his physician for medical malpractice that could be exercised up to three years after the date of discovery, with no final repose period.

The statute of limitations applicable to any action, however, is generally the one in effect at the date the cause of action accrued—in this case, 1982. *Cavanaugh,* 145 Vt. at 521, 496 A.2d at 161. This general rule must give way, of course, if its application would deprive plaintiff, as he maintains, of his con-

---

[1] The repose period does not apply "where fraudulent concealment has prevented the patient's discovery of the negligence" or where "the action is based upon the discovery of a foreign object in the patient's body." 12 V.S.A. § 521. Also inapplicable is the twenty-year repose provision of § 518(a) for actions "to recover for ionizing radiation injury or injury from other noxious agents medically recognized as having a prolonged latent development."

stitutional right to a remedy, under Chapter I, Article 4 of the Vermont Constitution.[2]

Article 4 provides:

> Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain right and justice, freely, and without being obliged to purchase it; completely and without any denial; promptly and without delay; conformably[3] to the laws.

Defendant Beeken argues that because Article 4 creates no affirmative rights and because the legislature has the power to modify or abolish a previously existing common-law right, see *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 88 n.32 (1978), the repose provision is valid and must be enforced.

■ We disagree, and hold that the seven-year repose period does not bar plaintiff's suit. We do not, however, reach the broad question of the statute's general validity under Article 4. Rather, our reason for rejecting defendant's repose defense lies in the timing of this lawsuit in relation to the enactment of the statute. Plaintiff alleges that his injuries were caused by acts or omissions of the defendant, as noted above, in 1972, six years prior to the enactment of § 521. We hold that his right to recover vested in 1972 and could not be destroyed by subsequent legislation. See *Gibbes v. Zimmerman*, 290 U.S. 326, 332 (1933).

■ While the legislature may impose reasonable limitations on rights of action, due process does not permit the legislature to annul vested rights. "[A]lthough a vested cause of

---

[2] Plaintiff also claims that the repose provision violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. This argument is based on § 521's differential treatment of medical malpractice plaintiffs with foreign objects in their bodies—who are not limited by the seven-year repose period—and those whose injuries do not arise from foreign objects—who are limited by the repose period. See *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980). In light of our disposition on the state constitutional claim, we advance no view on the equal protection argument.

[3] The word is spelled "comformably" in the Constitution; we presume "conformably" was intended.

action is property and is protected from arbitrary interference, the appellant has no property, in the constitutional sense, in any particular form of remedy; all that he is guaranteed by the Fourteenth Amendment is the preservation of his substantial right to redress by some effective procedure." *Id.* (citation omitted). Dr. Beeken acknowledges as much, but maintains that plaintiff's right to recover for his injuries could not vest until his cause of action accrued, that is, when he discovered the cause of his injuries in 1982, and that at that time § 521 was already in force and its repose period already expired. See *Pitts v. Unarco Industries, Inc.*, 712 F.2d 276, 279 (7th Cir.), *cert. denied*, 464 U.S. 1003 (1983).

Accrual and vesting, however, are not identical concepts. We measure accrual from the date of discovery so that a limitations period will not unfairly bar relief. See *Cavanaugh*, 145 Vt. at 522, 496 A.2d at 158 (overruling prior case law, "this Court has decided . . . that the term 'accrue' should be given a uniform meaning, regardless of when any particular cause of action actually arose"). Plaintiff's right under the common law, by contrast, vested, or "arose" in *Cavanaugh*'s language, in 1972 at the time of the alleged malpractice. A vested right is "[a] right complete and consummated, and of such character that it cannot be divested without the consent of the person to whom it belongs, and fixed or established, and no longer open to controversy." Black's Law Dictionary 1402 (5th ed. 1979). Plaintiff's right was fixed in this sense in 1972 because the controlling statute of limitations at the time, § 512, did not contain a repose provision. The right, that is, would not be rendered unenforceable by the mere passage of time. The *exercise* of the right awaited only plaintiff's discovery of the injury and its cause. In contrast, had § 521 been in force in 1972, plaintiff's right would have vested only upon discovery of his cause of action within seven years of the treatment. *Cavanaugh*'s effort to mitigate unfairness to plaintiffs by measuring accrual from the date of discovery should not be turned against plaintiffs, with no apparent logic, by also measuring the dissimilar concept of vestedness from the date of discovery.

Plaintiff's cause of action arose at the time of the defendant's claimed negligence, at which moment his cause acquired the status of a property right in the form of a "substan-

tial right to redress by some effective procedure." *Gibbes v. Zimmerman*, 290 U.S. at 332. Section 521 deprives plaintiff of due process because it forecloses all manner of redressing the violation of his vested rights.

Precisely the same circumstances were addressed in *Pucci v. Santi*, 711 F. Supp. 916 (N.D. Ill. 1989). In *Pucci*, the defendants, sued in August 1987 for April 1981 violations of Illinois securities laws, claimed that the action was barred by a five-year statute of repose. The repose provision was added only in January 1986, however. *Id.* at 921. Prior to the amendment, the Illinois statute of limitations for state law securities claims was three years, which could be extended by principles of equitable tolling. *Id.* at 922–23. The federal court found that "[b]y establishing their right to toll the old version of ¶ 137.13 D, the plaintiffs have shown that their state securities claims remained viable when the amended version took effect in 1986." In contrast, "the new version contains a period of repose which cannot be tolled and which expired before the plaintiffs filed their suit." *Id.* at 923. Consequently, the court was required to consider the effect of the amendment on the plaintiffs' claims.

Under established Illinois law, the court stated, an amendment shortening a limitation period is applied retroactively, "provided there is a reasonable time after the effective date of the amendment within which to bring the action." *Id.* at 924. The court calculated that the plaintiffs' claims would be barred under the new statute in April 1986, four months after the amendment became effective, and concluded: "Since the plaintiffs allegedly did not even discover the wrongdoing until September 1986, this court cannot say that the four-month period between January and April was a reasonable time for them to file suit." *Id.*[4]

---

[4] The court in *Pucci* went on to state that, under Illinois law, "where a statute of repose replaces a statute of limitations, a plaintiff whose cause of action would not have been barred under the limitations statute has from the effective date of the amendment until the expiration of the repose period to file his lawsuit." 711 F. Supp. at 924–25 (citing *Costello v. Unarco Indus., Inc.*, 111 Ill. 2d 476, 486, 490 N.E.2d 675, 680 (1986) (Clark, C.J., concurring)). The plaintiffs, that is, had five years from January 1986, the effective date of the repose provision, in which to commence their action. Since they complied, their securities claims were timely. *Id.* at 925. Other states have

As in *Pucci*, plaintiff here discovered (in 1982) the defendant's wrongdoing only after the repose period, measured from the date of the treatment (1972), had expired. As in *Pucci*, the wrongdoing occurred when a more liberal statute of limitations was in force and the plaintiff's claims under the earlier statute remained viable when the new version took effect (1978). We agree with the federal court that in such circumstances plaintiff is unconstitutionally denied a reasonable time within which to bring his action. Identical principles are stated by other courts. See, e.g., *Currie v. Schon*, 704 F. Supp. 698, 701 (E.D. La. 1989) ("there are constitutional restrictions on the impairment of vested rights which can limit retroactive application of statutes of limitation").

 We hold that a person must be permitted a reasonable time in which to file an action that arose and remained viable under a prior statute of limitations, and that plaintiff was denied that right by the trial court.

*Reversed and remanded.*

**Morse, J.**, concurring. Although I agree with the result, I concur separately because the Court's analysis is overbroad and unnecessarily reaches a constitutional issue. *State v. Clarke*, 145 Vt. 547, 551, 496 A.2d 164, 167 (1985).

A simpler answer is that retroactive application of the repose provision to bar plaintiff's action is prohibited by 1 V.S.A. § 214, which deals with the effect of amendment or repeal of legislation on pre-existing rights and remedies. Under 1 V.S.A. § 214(b)(2), a statutory change shall not "[a]ffect any right, privilege, obligation or liability acquired, accrued or incurred prior to the effective date of the amendment or repeal." At the time of plaintiff's injury in 1972, he acquired a right of redress. The nature of that right—vested or inchoate—is not relevant. By the express terms of § 214(b)(2), that right cannot be affected—and certainly not eliminated—by a later change in the statute of limitations. Rather, the repose provision of 12 V.S.A.

adopted the same rule. See, e.g., *Merrigan v. Epstein*, 112 Wash. 2d 709, 717, 773 P.2d 78, 82 (1989) ("The time limit for bringing a claim under a new statute begins to run upon pre-existing claims only on the effective date of the statute.").

§ 521, enacted in 1978, is limited to prospective application; it cannot operate to affect plaintiff's previously acquired right to bring this action. *Stewart v. Darrow*, 141 Vt. 248, 252, 448 A.2d 788, 790 (1982).

Likewise, the Court's adoption of a rule providing plaintiff with a reasonable amount of time after the amendment of the statute of limitations to bring an action is unnecessarily uncertain. The more straightforward remedy is not to apply the offensive portion of § 521—i.e., the repose period—against the plaintiff, but to enforce the remainder of the statute, giving plaintiff two years from the date the injury is or reasonably should have been discovered to bring an action.

I am authorized to say that Justice Barney joins in this concurrence.