NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 50

No. 24-AP-356

| | |
|---|---|
| PeakCM, LLC | Supreme Court |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Civil Division |
| Mountainview Metal Systems, LLC et al. | June Term, 2025 |

Samuel Hoar, Jr., J. (final judgment);
Helen M. Toor, J. (motions to amend complaint (PeakCM)/summary judgment (ATAS))

Alexander J. LaRosa of MSK Attorneys, Burlington, for Plaintiff-Appellant.

Shapleigh Smith, Jr. and Jeffrey N. Kaplan of Dinse P.C., Burlington, for Defendant-Appellee
  ATAS International, Inc.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.     **EATON, J.**  In 2019, multiple siding panels fell off a newly constructed hotel in St. Albans, Vermont.  Plaintiff, PeakCM, LLC, the general contractor responsible for the hotel's construction, initially sued the siding-panel installer, Mountainview Metal Systems, LLC. Plaintiff then amended its complaint to add a product-liability claim against the siding-panel manufacturer, ATAS International, Inc.  Plaintiff appeals from the trial court's decisions to deny plaintiff's motion to amend its complaint for the third time and to grant ATAS summary judgment on plaintiff's product-liability claim and on a separate implied-indemnity claim brought against ATAS by Mountainview.  We affirm.

I. Facts

¶ 2.     The following facts are undisputed except where otherwise noted.  In 2016, plaintiff was hired as the general contractor for a hotel-construction project in St. Albans, Vermont.  In turn, plaintiff hired an architect to design the project.  That design involved the installation of specific metal exterior wall siding panels manufactured by ATAS.  In keeping with that design plan, plaintiff subcontracted with a separate firm, Mountainview, to purchase the metal wall panels from a third-party distributor and then install them on the hotel.

¶ 3.     In its bid for the project, Mountainview stated that the wall-panel installation would be done to the "manufacturer's specifications" and, accordingly, included all relevant information sheets then-available on ATAS's website.  These sheets included detailed installation information in addition to a section labeled "technical services" which stated that "[c]omplete technical information and literature are available at www.atas.com" and that "ATAS will assist with design ideas and shop drawings."  Upon receiving the bid, plaintiff and the architect reviewed ATAS's website to confirm that the bid documents were correct and that Mountainview would be installing the panels pursuant to ATAS's specifications.  Plaintiff subsequently accepted Mountainview's bid and Mountainview installed the wall panels without a splice plate, relying on the information from ATAS's website.[1]

¶ 4.     According to plaintiff, the information available on ATAS's website did not include any information stating that the use of a splice plate was necessary to connect the ends of the panels. Mountainview was aware of splice plates as an option to connect panels but elected to use a "bayonet" method instead because Mountainview believed that the bayonet method would perform better in high wind.  Mountainview also stated that it does not "really care for" splice plates.

---

[1]  A splice plate is a piece of metal designed to connect two panels and prevents the ends from separating while allowing the panels to flex and move.

¶ 5.    The next year, plaintiff noticed that the installed panels appeared wavy—a phenomenon known in the construction industry as "oil canning." Plaintiff and architect sent an email to ATAS asking about the issue and included photos of the ongoing installation. The photos showed that splice plates were not being used to install the panels. ATAS subsequently sent a representative to the site to view the oil canning and speak to the parties about possible solutions. According to plaintiff, ATAS affirmed that the panel installation was proper. In a letter sent in March 2017, ATAS also stated that the oil canning was caused by the substrate, which was the material used under the panels. In that letter, ATAS also wrote that "[f]lashing and splicing the panels must be taken into consideration for the proper panel movement."

¶ 6.    However, unbeknownst to plaintiff and Mountainview during the installation, ATAS had created an information sheet in 2006 indicating that the panels were supposed to be connected with a splice plate. According to plaintiff, the 2006 information sheet was not available on ATAS's website when Mountainview and plaintiff planned the installation in 2016. Instead, according to plaintiff, the detail sheet was only published on ATAS's website at some point after March of 2017—after the panels had been installed on the hotel.

¶ 7.    In 2019, the panels began to come off the hotel. Some panels fell onto the street and narrowly missed cars, people, and other property. Other panels fell onto a neighboring building and caused minor damage to its roof.

## II.  Procedural History

¶ 8.    In March 2020, plaintiff sued Mountainview alleging five counts: (1) breach of subcontract, (2) breach of warranty, (3) breach of duty to correct defects, (4) indemnity, and (5) negligence. In November 2020, plaintiff amended its complaint for the first time to add a product-liability claim against ATAS. The amended complaint asserted that during installation, ATAS's publicly available instructions did not include an information sheet that recommended installing a splice plate to connect the panels. Plaintiff further alleged, however, that after the hotel was constructed, ATAS released such an information sheet. Discovery commenced and

3

Mountainview and ATAS cross-claimed for indemnity against each other and impleaded the project's architect.[2]

¶ 9.    Two years later, in December 2022, plaintiff moved to amend its complaint for a second time and the trial court granted the motion shortly thereafter.  In the second amended complaint, plaintiff adjusted its product-liability claim against ATAS.  Specifically, plaintiff added language stating that ATAS failed to provide adequate installation specifications for the panels and did not release to the public, installers, or other professionals any design information showing that a splice plate was required for panel stability.  Plaintiff also alleged that ATAS did not warn any parties at the time of installation that a splice plate was required.  Finally, plaintiff alleged that upon seeing the wall constructed without a splice plate, ATAS did not inform the parties that panel installation required a splice plate; "[r]ather it meekly suggested a splice plate was an option."

¶ 10.    In that same month, ATAS moved for summary judgment on plaintiff's product-liability claim and on Mountainview's crossclaim for implied indemnity.  ATAS argued that the economic-loss rule barred both claims.

¶ 11.    Subsequently, on February 17, 2023, plaintiff moved to amend its complaint for the third time.  At that time, the discovery schedule, which had been amended three times, was due to close six days later on March 1 and pretrial motions were due by March 15.[3]  Plaintiff sought to add over 100 new allegations and four new claims against ATAS: breach of contract, breach of warranty, indemnity, and negligence.  Plaintiff contended that it was justified in bringing the new allegations and claims because discovery had brought to light that "in March 2006 ATAS prepared

_____

[2]  The court granted architect's summary-judgment motion in September 2023, holding that ATAS and Mountainview had not presented expert evidence demonstrating architect had breached its professional standard of care.  See Est. of Fleming v. Nicholson, 168 Vt. 495, 497, 724 A.2d 1026, 1028 (1998) ("If the alleged negligent conduct is a matter of judgment unique to that profession . . . elements must be established by expert testimony to assist the trier of fact in determining negligence.").

[3]  In its brief, plaintiff also indicates that the motion to amend was made before ATAS's expert was deposed on February 24, 2023, and that additional depositions were scheduled for May 2023.

an installation detail and instruction that showed the Design Wall panels need to be installed with a 'splice plate.' " According to plaintiff, this revealed that ATAS had known that the panels needed to be installed with a splice plate, but that ATAS had failed to make that instruction known to the parties during sale, had failed to make that instruction public, and then had even failed to inform the parties of this requirement in 2017 when ATAS reviewed the installation onsite.

¶ 12. Plaintiff also argued that, pursuant to its contract with Mountainview, it had the ability to assume Mountainview's claims if plaintiff determined that Mountainview was not adequately pursuing its claims and defenses. According to plaintiff, it wished to exercise this right because Mountainview was now reasonably likely to default and had conveyed an intent not to litigate whatever claims and defenses it had against ATAS. Plaintiff also argued that many of Mountainview's claims would inure to the benefit of plaintiff.

¶ 13. The trial court denied plaintiff's motion to amend its complaint for the third time. First, the court held that plaintiff had no contractual right to assume Mountainview's potential claims. The court reasoned that plaintiff identified no provision of the subcontract that allowed plaintiff to assume claims that Mountainview may have had against other parties. According to the court, the subcontract provision cited by plaintiff to support its assertion provided only that plaintiff could assume its own defense if it determined that the defense being provided by Mountainview was inadequate—which did not reflect the situation in the case before the court. **PC, 7**.

¶ 14. Second, the court held that plaintiff caused undue delay in asserting the new claims and that the amendment would result in prejudice to ATAS. The court reasoned that plaintiff failed to explain why it could not have brought any of the new claims during the prior two years when it had been aware of its splice-plate and warranty theories in November 2020 at the latest. The court also noted that these claims would prejudice ATAS because they would require ATAS to shift focus and litigate entirely different theories, engage in additional discovery, and would almost certainly lead to another round of summary-judgment motions.

¶ 15.    Simultaneously, the trial court granted ATAS's motion for summary judgment on plaintiff's product-liability claim and Mountainview's implied-indemnity claim because it concluded that the economic-loss rule barred both claims.  Plaintiff appealed.

### III.  Discussion

¶ 16.    On appeal, plaintiff argues that the court abused its discretion when it denied plaintiff's motion to amend the complaint for a third time.  Plaintiff also argues that the trial court erred in granting summary judgment to ATAS on plaintiff's product-liability claim because both the "other-property" and "special-relationship" exceptions to the economic-loss rule apply.  Finally, plaintiff argues that the court improperly granted summary judgment to ATAS on Mountainview's implied-indemnity claim.  We address each argument in turn.

### A.  Motion to Amend

¶ 17.    Under Vermont Rule of Civil Procedure 15(a), once a responsive pleading is served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave to amend shall be freely given when justice so requires."  We have stated that "trial courts are to be liberal in permitting amendments to the pleadings."  Lillicrap v. Martin, 156 Vt. 165, 170, 591 A.2d 41, 44 (1989) (citing V.R.C.P. 15(a)).

¶ 18.    When a party moves to amend its pleading, the trial court has discretion to determine whether an amendment should be permitted.  Id.  On review, "[t]he issue is not whether we would have granted the motion to amend had we been similarly situated; nor is it whether the lower court could have granted the motion to amend in the proper exercise of its discretion."  Gauthier v. Keurig Green Mountain, Inc., 2015 VT 108, ¶ 47, 200 Vt. 125, 129 A.3d 108.  Instead, "[w]e will reverse the action of the trial court on such rulings only where there is an abuse of discretion."  Lillicrap, 156 Vt. at 170, 591 A.2d at 44.  An abuse of discretion exists where a court "failed to exercise its discretion, or . . . its discretion was exercised on reasons clearly untenable, or to an extent clearly unreasonable."  In re Burke, 2019 VT 28, ¶ 46, 210 Vt. 157, 212 A.3d 189 (quotation omitted).

6

¶ 19. We have held that a trial court may deny a motion to amend based on considerations of undue delay, bad faith, futility of amendment, and prejudice to the opposing party. Colby v. Umbrella, Inc., 2008 VT 20, ¶ 4, 184 Vt. 1, 955 A.2d 1082. However, "[w]hen there is no prejudice to the objecting party, and when the proposed amendment is not obviously frivolous nor made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny the motion." LeClair v. LeClair, 2017 VT 34, ¶ 28, 204 Vt. 422, 169 A.3d 743 (quotation omitted).[4] When applying its discretion, the court should consider the policies behind our liberal amendment standard:

> "(1) to provide maximum opportunity for each claim to be decided on its merits rather than on a procedural technicality, (2) to give notice of the nature of the claim or defense, and (3) to enable a party to assert matters that were overlooked or unknown to him at an earlier stage in the proceedings."

Id. ¶ 27 (quotation omitted).

¶ 20. The court acted within its discretion in denying plaintiff's motion to amend based on undue delay and prejudice to ATAS. We begin with the court's discussion of undue delay. The record supports the court's conclusion that there was undue delay because the new claims were based on a theory of which plaintiff had been aware since it originally filed its complaint against ATAS. See Hickory v. Morlang, 2005 VT 73, ¶ 6, 178 Vt. 604, 878 A.2d 318 (mem.) (holding undue delay existed when party had opportunity to bring forward claim or amend complaint at earlier time but elected not to). The court concluded that plaintiff had "offer[ed] no valid rationale for waiting over two years to bring additional claims against ATAS based on [the] splice plate theory" when earlier pleadings demonstrated that it was aware that ATAS had released an information sheet recommending the use of splice plates—the discovery of which was the

---

[4] Both rule statements cited above stem from this Court's adoption of the rule articulated in Foman v. Davis, 371 U.S. 178 (1982). See Bevins v. King, 143 Vt. 252, 254-55, 465 A.2d 282, 283 (1983) (articulating rule that "[w]hen there is no prejudice to the objecting party, and when the proposed amendment is not obviously frivolous nor made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny the motion" (citing Foman, 371 U.S. at 182)); Perkins v. Windsor Hosp. Corp., 142 Vt. 305, 313, 455 A.2d 810, 816 (articulating rule that trial court should examine "(1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party" (citing Foman, 371 U.S. at 182)).

purported basis for the new claims—as early as plaintiff's first amended complaint. Cf. LeClair, 2017 VT 34, ¶ 32 (describing motion to amend as appropriate when "new claims address[ed] issues that were clearly overlooked earlier in the litigation"). Regarding plaintiff's proposed warranty claim, the court reasoned that plaintiff "knew of the potential existence of a warranty when it filed its initial complaint in March 2020, given that it filed a warranty claim against Mountainview at that time." Thus, the court reasonably concluded that there had been undue delay.

¶ 21. The court also considered the amendment's effect on the case and concluded that the amendment was prejudicial to ATAS because it was "difficult to imagine how the proposed amendment will not require additional discovery" when plaintiff "seeks to add dozens of paragraphs of additional facts and four additional claims against ATAS." The court also reasoned that the amendment would have required ATAS "to shift focus and litigate entirely different theories of contract, warranty, negligence, and indemnity" and would "almost certainly lead to yet another round of summary judgment motions." Relative to this extensive adjustment to the claim and legal theories in the case, the court also recognized that plaintiff's proposed third amendment came at a time when discovery was to close in six days, and therefore, "[f]or all practical purposes, discovery was over." Accordingly, the court reasonably concluded that "[t]he proposed amendment will inevitably result in prejudice" to ATAS.

¶ 22. Plaintiff argues that ATAS would not be prejudiced by the proposed amendment because the new legal claims plaintiff sought to add were based on facts already in the case and already within the scope of ATAS's expert disclosures. When analyzing potential prejudice, the court can consider whether a legal issue "has permeated th[e] case from the start" such that the opposing party has been put "on notice" of the issue in the proposed amendment. Lillicrap, 156 Vt. at 171, 591 A.2d at 44.

¶ 23. In this case, however, the court reasonably disagreed with plaintiff's interpretation of the new claims. The court explained that the material legal issues within the new claims had not permeated the case from the start, and instead would have required ATAS to shift focus and

8

litigate entirely different theories of contract, warranty, negligence, and indemnity, and would require discovery into the basis for plaintiff's allegation that it had a contractual relationship with ATAS. See Gauthier, 2015 VT 108, ¶ 46 (explaining courts may consider whether party has already "marshaled its resources to respond to the allegations made in the existing complaint"); 6 Wright & Miller, Federal Practice & Procedure § 1487 (3d. ed. 2025) ("[I]f the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial."); see also Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) (same). Thus, the court's conclusion that plaintiff's third amended complaint would result in prejudice to ATAS is supported by the record and is not made on clearly untenable grounds.

¶ 24. Plaintiff argues that the court erred in suggesting that post-summary-judgment amendments are not allowed, and states that plaintiff's proposed amendment could not be prejudicial because it was timely filed prior to the close of discovery. "[T]he fact that the case had reached the summary judgment stage [is not] determinative." LeClair, 2017 VT 34, ¶ 31. But the timing of a motion to amend is certainly relevant to whether the opposing party will suffer prejudice. See, e.g., Bevins, 143 Vt. at 256, 465 A.2d at 284 ("[T]he practice of filing motions to amend pleadings on the day of trial is clearly to be avoided. In many cases, the nonmoving party will be prejudiced by such action."). Accordingly, the earlier a proposed amendment is brought forward, the "less likely [it is] to result in prejudice to the opposing party." LeClair, 2017 VT 34, ¶ 35. However, the timing of a proposed amendment must be analyzed with the other pertinent considerations outlined by this Court. For example, as discussed above, in Lillicrap v. Martin, this Court affirmed a trial court's decision to grant a motion to amend on the sixth day of a trial, in part because the legal theory and issue had "permeated th[e] case from the start." 156 Vt. at 171, 591 A.2d at 44. Conversely, in Gauthier, we affirmed a trial court's decision to deny a motion to amend prior to trial—but following summary-judgment motions—because the trial court appropriately "balanced the policy objectives" outlined in Bevins with prejudice and undue delay. Gauthier,

9

2015 VT 108, ¶ 46 (referencing Bevins, 143 Vt. at 255, 465 A.2d at 283). The trial court must assess the relevant factors as they apply to each particular case.

¶ 25. In this case, while the proposed amended complaint was filed a few days before the discovery deadline, the court appropriately assessed the situation at hand by comparing the volume of new allegations and claims to the short time left before the close of discovery. Contrary to plaintiff's arguments, the mere fact that a proposed amendment was filed shortly before the discovery deadline does not automatically dictate that the amendment is not prejudicial, and the court did not abuse its discretion by holding otherwise.

¶ 26. Finally, plaintiff contends that the court improperly asserted that plaintiff had to demonstrate good cause for its delay. Plaintiff cites LeClair, where this Court stated that absence of good cause for the delay was not a ground to deny a motion to amend. LeClair, 2017 VT 34, ¶ 29. We disagree with plaintiff's characterization of the trial court's decision. The court considered plaintiff's reasons for bringing its third amendment in the context of a broader analysis. It considered whether plaintiff could have brought the new claims based on the factual information plaintiff had and whether the relevant legal issues had permeated the case from the start. It reasonably concluded that the inexplicably late stage that these claims were brought, combined with the prejudice that they would incur, justified denying plaintiff's motion to amend. We see no imposition of a good-cause burden on plaintiff in the court's decision here.

¶ 27. The trial court's analysis can be contrasted with the situation in LeClair, where the Court solely focused on prejudice. Id. ¶ 28 (restricting analysis to "whether granting the amendment would prejudice defendant" because trial court did not find proposed amendment "dilatory maneuver in bad faith" (quotation omitted)). Additionally, we have frequently stated that the court may consider undue delay when faced with a motion to amend. See Colby, 2008 VT 20, ¶ 4. Even in LeClair, we described that a party's justification for bringing an amendment is a relevant consideration. 2017 VT 34, ¶ 32. Specifically, we favorably described our reasoning in Gauthier, stating that the "tenuous relationship between . . . new and original claims and [a]

10

plaintiff's inability to explain the timing of his amendment governed both the trial court's and our decision." Id. We elaborated that in Gauthier, "the trial court properly denied the amendment because the defendant did not have notice of the plaintiff's new claims, nor did the new claims address issues that were clearly overlooked earlier in the litigation." Id. (citing Bevins, 143 Vt. at 255, 465 A.2d at 283). Thus, the court considered the appropriate factors in exercising its discretion to deny the motion to amend in this case.

## B. Product-Liability Claim and the Economic-Loss Rule

¶ 28. We next address plaintiff's argument that the trial court erred when it granted ATAS's motion for summary judgment on plaintiff's product liability claim. This Court reviews summary-judgment decisions de novo, using the same standard as the trial court. Gauthier, 2015 VT 108, ¶ 14. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). "An issue of fact is material only if it might affect the outcome." In re Est. of Fitzsimmons, 2013 VT 95, ¶ 13, 195 Vt. 94, 86 A.3d 1026 (quotation omitted).

¶ 29. Under Vermont law, the economic-loss rule functions to separate claims that should be brought under contract law from those that should be brought under tort law. Specifically, " '[t]he rule serves to maintain a distinction between contract and tort law' because '[i]n tort law, duties are imposed by law to protect the public from harm, whereas in contract the parties self-impose duties and protect themselves through bargaining.' " Veljovic v. TD Bank, N.A., 2025 VT 38, ¶ 11, __ Vt. __, __ A.3d __ (alterations in original) (quoting Long Trail House Condo. Ass'n v. Engelberth Const., Inc., 2012 VT 80, ¶ 10, 192 Vt. 322, 59 A.3d 752). Consequently, the economic-loss rule generally "prohibits recovery in tort for purely economic losses." Id. (quotation omitted). "Economic loss is defined as 'damages other than physical harm to persons or property.' " Id. ¶ 10 (quoting Springfield Hydroelectric Co. v. Copp, 172 Vt. 311, 315, 779 A.2d 67, 71 (2001)). In the construction context, we have articulated that "the remedy for purely economic losses resulting from the reduced value or costs of repairs of . . . construction defects

11

sound[s] in contract rather than tort" law. Long Trail House Condo. Ass'n, 2012 VT 80, ¶ 11 (alterations in original) (quotation omitted).

¶ 30. This Court recognizes two exceptions to the economic-loss rule: the "other-property" exception and the "special-relationship" exception. See Walsh v. Cluba, 2015 VT 2, ¶ 28, 198 Vt. 453, 117 A.3d 789 (recognizing other-property exception); Veljovic, 2025 VT 38, ¶ 12 (describing special-relationship exception). Plaintiff does not contest that the economic-loss rule applies generally. However, plaintiff argues that one or both of the exceptions to the rule allow plaintiff to bring its product-liability claim against ATAS. We disagree.

¶ 31. Under the other-property exception, the economic-loss rule does not apply if there has been some "accompanying physical harm" beyond purely economic loss. Walsh, 2015 VT 2, ¶ 28 (quotation omitted) ("Negligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm." (quotation omitted)). "The physical harm may be to property rather than persons, but injury to the product or property that is the subject of a contract is generally considered a disappointed economic expectation for which relief lies in contract rather than tort law." Id.

¶ 32. In the trial court, plaintiff argued that the other-property exception to the economic-loss rule applied because the hotel was damaged in addition to the splice plates, and plaintiff was required to pay for the damage. The court concluded that the other-property exception did not apply in the context of the damage to the hotel, relying on case law that draws a distinction between the subject of the contract and the "other property." These cases hold that the exception applies only where the two pieces of property are not an "integrated package" or a "single unit." E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 867 (1986); see also Walsh, 2015 VT 2, ¶ 28 (explaining damage to property that is subject of contract would not be other property and recovery would be barred by economic-loss rule). The court reasoned that because any property

12

damage caused by the allegedly defective siding installation was to the hotel building—and thus, part of the integrated whole—the other-property exception did not apply.

¶ 33. Plaintiff does not challenge the court's reasoning on appeal. Instead, rather than relying on damage to the hotel as it did in the trial court, plaintiff now argues for the first time that the other-property exception applies because there was minimal damage to "abutting properties"— namely, the neighboring building's roof. "To properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." State v. Ben-Mont Corp., 163 Vt. 53, 61, 652 A.2d 1004, 1009 (1994). This is a new argument that rests on different factual underpinnings and a different legal analysis, which the trial court did not have the opportunity to address in its decision. Consequently, this argument was not preserved and we decline to consider it. Id.; see also State v. Cushing, 2015 VT 114, ¶ 2, 200 Vt. 646, 128 A.3d 896 (mem.) ("This Court will not address arguments raised for the first time on appeal.")

¶ 34. We now turn to plaintiff's argument that the special-relationship exception to the economic-loss rule applies, which it did preserve by raising below. In Veljovic v. TD Bank, N.A., we explained that "in some circumstances, a plaintiff asserting a negligence claim may be able to recover for purely economic losses where there is a special relationship between the plaintiff and the defendant, and the defendant has assumed the responsibility not to violate a professional duty owed to the plaintiff." 2025 VT 38, ¶ 12. In such cases, which typically involve providers of professional services, "the determining factor is the type of relationship created between the parties." EBWS, LLC v. Britly Corp., 2007 VT 37, ¶ 31, 181 Vt. 513, 928 A.2d 497. Specifically, "[a] special relationship requires a close relationship of trust, confidence, or reliance between the parties." Veljovic, 2025 VT 38, ¶ 13. Such a relationship emerges "most often [as] a professional relationship such as doctor-patient or attorney-client". Walsh, 2015 VT 2, ¶ 30; see also Veljovic, 2025 VT 38, ¶ 13 (collecting cases describing special relationships).

¶ 35. Facts that may support the establishment of a special relationship include: "(1) whether the defendant 'initiated a close relationship' with the plaintiff; (2) whether the defendant endorsed an action to 'members of the public generally' or through personal solicitation and individualized relationships; and (3) whether the defendant targeted 'a narrow class of identified people' who 'relied on' the defendant's representations." Veljovic, 2025 VT 38, ¶ 14 (quoting Sutton v. Vt. Reg'l Ctr., 2019 VT 71A, ¶ 33, 212 Vt. 612, 238 A.3d 608). In addition, when analyzing the parties' relationship, the court may also consider whether the defendant "promis[ed] exceptional oversight and management." Sutton, 2019 VT 71A, ¶ 33.

¶ 36. We are unpersuaded by plaintiff's argument that the relationship between itself and ATAS rose to the level of a special relationship for the purpose of this exception. Sutton v. Vermont Regional Center is the sole case where this Court has held that a special relationship existed sufficient for the exception to apply. See 2019 VT 71A, ¶ 33. In Sutton, the defendants represented that they would help foreign investors gain eligibility for capital-investment-based EB-5 visas by recommending and managing their investments in approved projects. Id. ¶¶ 2-3. The defendants "personally solicited" and then "initiated a close relationship with [the] plaintiffs by recruiting them to invest their life savings" in the projects. Id. ¶¶ 32-33. Each relationship between the defendants and the plaintiffs was individualized and each plaintiff paid "substantial fees . . . in connection with that relationship." Id. ¶ 33. The defendants promised "exceptional oversight and management" of the plaintiff's investments. Id. This involved the defendant's active "administration, oversight, auditing, and consultation" to ensure that the investments complied with applicable immigration and securities laws and regulations and would result in a "faster path to [EB-5] approval." Id. ¶ 3.

¶ 37. In this case, unlike in Sutton, there is no evidence that plaintiff and ATAS had a "close relationship" where "exceptional oversight and management" was promised or performed. Id. ¶ 33. ATAS neither "personally solicited" the work, nor did it enter into an ongoing "individualized relationship[]" with plaintiff. Id. Instead, plaintiff and ATAS's relationship here

was far briefer and less involved. Mountainview purchased the panels from a third-party distributor and utilized the publicly available information sheets on ATAS's website to install the panels. While the information sheets stated that, upon request, "ATAS will assist with design ideas and shop drawings," this type of assistance was not requested or provided. See Long Trail House Condo. Ass'n,. 2012 VT 80, ¶ 22, (holding no special relationship existed despite "reference to 'value engineering' or the other services" that could have been provided but were not). During installation, plaintiff reached out directly to ATAS only when oil canning became an issue. ATAS's email responses to plaintiff's inquiries, offering a possible explanation for the oil canning and suggesting solutions do not demonstrate the "exceptional oversight and management" or reliance required for a special relationship. See EBWS, 2007 VT 37, ¶ 32 (holding no special relationship existed even when defendant designed and built creamery for plaintiff because plaintiff "did not rely on the defendant to provide it with a professional service, and, consequently paid for the services of a contractor not a professional architect"). The purchase of the panels by plaintiff's subcontractor, plaintiff's brief in-person encounter and emails with ATAS representatives, and plaintiff's reliance on web-based information produced by ATAS, did not create a special relationship between plaintiff and ATAS sufficient for the purpose of this exception to the economic-loss rule.

¶ 38. Plaintiff argues that ATAS owed plaintiff a duty to provide accurate information that plaintiff was intended to rely on, and that this intended reliance is sufficient to support the existence of a special relationship. See Limoge v. People's Tr. Co., 168 Vt. 265, 268-69, 719 A.2d 888, 890 (1998) (outlining requirements for negligent-misrepresentation claim). Essentially, plaintiff attempts to use the duty outlined in negligent-misrepresentation claims to establish a special relationship between ATAS and plaintiff. This interpretation would drastically expand the special-relationship exception to the point of swallowing the economic-loss rule. It ignores the typical determining factor that there be a professional service provided in the relevant interaction between the parties—with a corresponding heightened standard of care. See EBWS, 2007 VT 37,

15

¶ 32 (collecting cases justifying special-relationship exception due to enhanced expected liability exposure and high standards of care for professionals); Restatement (Third) of Torts: Liab. for Econ. Harm § 4 (2020) (describing special-relationship exception justified by heightened standard of care and describing construction contractors and tradesmen as nonprofessionals). Because these factors were not present here, the trial court correctly ruled that the special-relationship exception to the economic-loss rule did not apply.

¶ 39. Plaintiff failed to demonstrate that either exception to the economic-loss rule applies here; accordingly, the economic-loss rule bars plaintiff's product liability claim. Thus, the trial court appropriately granted ATAS's motion for summary judgment.

### C. Implied Indemnity Claim

¶ 40. Finally, plaintiff argues that the trial court erred when it granted summary judgment to ATAS on Mountainview's implied indemnity claim because equity requires implied indemnity in this case. ATAS argues that plaintiff lacks standing to bring this claim on appeal. We agree.

¶ 41. In any case before this Court or a trial court, the plaintiff bears the burden to establish standing. See Hous. Our Seniors in Vt. Inc. v. Agency of Com. & Cmty. Dev., 2024 VT 12, ¶¶ 13-14, 219 Vt. 80, 315 A.3d 1000 (describing standing as plaintiff's initial burden); Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) ("[Plaintiff] bears the burden of showing that he has standing for each type of relief sought."). To establish standing to raise a claim on appeal, "the rights of the party seeking to appeal must be adversely affected by the judgment." In re M.C., 156 Vt. 642, 642–43, 590 A.2d 882, 882 (1991). "The plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." In re John L. Norris Tr., 143 Vt. 325, 328, 465 A.2d 1385, 1387 (1983) (alteration and quotation omitted).

¶ 42. Plaintiff does not explain how it has standing to appeal the court's decision on Mountainview's implied-indemnity claim. Plaintiff simply asserts that ATAS should indemnify Mountainview and plaintiff because ATAS is the party that is truly at fault. Plaintiff argues that

because ATAS's instructions were incomplete, Mountainview's work failed and Mountainview was subject to substantial liability, attorney's fees, and costs. This argument does not demonstrate how plaintiff—not Mountainview—has the right to appeal the trial court's summary-judgment decision on Mountainview's implied-indemnity claim. On appeal, plaintiff does not contest the court's ruling that nothing in the contract allows plaintiff to assume Mountainview's claims, and plaintiff does not identify any other legal basis for it to do so. Because plaintiff has not shown that it has the right to assert this argument on behalf of Mountainview, we decline to consider whether the trial court appropriately granted summary judgment on Mountainview's implied-indemnity claim. Ladd v. Valerio, 2005 VT 81, ¶ 3, 178 Vt. 614, 883 A.2d 764 (2005) (mem.) (holding "courts have no jurisdiction to grant the relief sought" when "the plaintiff lacks standing").

Affirmed.

FOR THE COURT:

_____

Associate Justice

17